1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9
10
11
12
13
14
15
16
17
18
19

| | |
|---|---|
| WILLIAM LEE JOHNSON, et al., | Case No.  1:19-cv-00105-JLT-SAB |
| Plaintiffs, | ORDER DENYING DEFENDANT PAPE TRUCKS INC.'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| RUSH ENTERPRISES, INC., et al., | (ECF Nos. 106, 107, 108, 109, 111) |
| Defendants. | |

## I.

## INTRODUCTION

20
21
22

This is a California state law product liability action[1] arising out of the personal injuries

23

sustained by Plaintiff William Johnson ("William") on December 21, 2018, as a result of an

24

explosion that occurred during the refueling of a compressed natural gas cylinder that was part of

25

the fueling system for a commercial vehicle.  William, by and through his guardian ad litem

26

Jerrad Johnson ("Jerrad") (see ECF No. 12), as well as Plaintiffs Joan Johnson and B&N

27

Trucking, Inc. ("B&N") (collectively "Plaintiffs") initiated this action on January 24, 2019.  (ECF

28

---

[1] The action is before this Court pursuant to diversity jurisdiction, which is not disputed by any of the parties.

No. 1.)

Presently before this Court is Defendant/Cross-Complainant/Cross-Defendant Pape Trucks, Inc.'s ("Pape") motion for summary judgment.[2] (ECF No. 106.) The motion has been opposed by Plaintiffs (ECF No 107), Defendant/Cross-Complainant/Cross-Defendant Carleton Technologies, Inc. dba Cobham Mission Systems ("Carleton")/Cobham PLC,[3] (ECF No. 108), and Intervenor Plaintiff Markel American Insurance Company ("Markel") (ECF No. 109). Pape has replied. (ECF No. 111.) A hearing on the motion was held on July 19, 2023. (ECF No. 115.) Counsel Christopher J. Dow appeared via videoconference for Pape. Counsel Matthew C. Clark and Thomas C Seabaugh appeared by videoconference for Plaintiffs. Counsel Vijay J. Patel appeared via videoconference for Carleton. Counsel Timothy E. Cary appeared by videoconference for Markel.

For the reasons set forth herein, the motion for summary judgment shall be denied.

## II.

## RELEVANT BACKGROUND

### A.    Plaintiffs' Allegations

Plaintiffs initiated this action on January 24, 2019. (ECF No. 1.) Plaintiffs filed the operative first amended complaint ("FAC") on February 14, 2019. (ECF No 13.) The operative first amended complaint proceeds against Defendants Carleton, Pape Trucks, and Natural Gas Fuel Systems, Inc. dba Momentum Fuel Technology ("Momentum") (collectively, "Defendants"). (ECF No. 1.)

Plaintiff B&N purchased a Kenworth tractor with Vehicle Identification Number ("VIN") 1NKYD39X3KJ294692, the subject commercial vehicle ("subject vehicle"), which was outfitted with a compressed natural gas ("CNG") fueling system affixed to the rear and passenger-side of

---

[2]  The parties have consented to the jurisdiction of the United States Magistrate Judge and this action has been assigned to Magistrate Judge Stanley A. Boone for purposes of final disposition of the instant motion for summary judgment only. (See ECF Nos. 112, 113.)

[3] Various filings interchangeably refer to Carleton dba Cobham Missions Systems as "Carleton" or "Cobham." (See ECF No. 22, 24, 33.) For consistency and ease of reference, the Court shall refer to this party herein as "Carleton." Carleton subsequently indicated that "Cobham PLC" indirectly owns 10% or more of Cobham Mission Systems (formerly Carleton). (ECF No. 50.) Cobham PLC was voluntarily dismissed on August 30, 2019. (ECF Nos. 51, 52.)

the passenger cabin ("CNG System" or "subject fuel system").  (FAC ¶ 16.)  The CNG System was comprised of three carbon fiber cylinders stacked vertically in a rack affixed to the rear of the passenger cabin.  (Id. at ¶ 17.)  These cylinders were enclosed in a metal box, and were connected with various lines, valves, and pressure relief devices.  (Id.)  This system also included a side-belly cylinder affixed to the passenger side of the subject vehicle.  (Id. at ¶ 18.)  Plaintiffs allege the subject vehicle and CNG System were purchased only days before the December 21, 2018 incident.  (Id. at ¶ 16.)

Defendant Momentum is a CNG fuel system manufacturer.  (Id. at ¶ 8.)  Plaintiffs allege Momentum designed and manufactured the CNG system, including the mounting rack, manifold, and control panel that were installed onto the subject vehicle.  (Id. at ¶¶ 19, 21.)  Plaintiffs further allege Momentum employees installed the CNG System onto the subject vehicle.  (Id. at ¶ 19.)

Defendant Carleton is a designer and manufacturer of pressure vessels.[4]  (FAC ¶ 9.)  Plaintiffs allege Carleton designed and manufactured the carbon fiber cylinders used in the CNG System, including the cylinder that ruptured/exploded on December 21, 2018.  (Id. at ¶ 20.)

Defendant Pape was, at all relevant times, a commercial vehicle manufacturer.  (Id. at ¶ 11.)  Plaintiffs allege the aforementioned installation took place at Pape's Kenworth dealership.  (Id. at ¶ 19.)  Plaintiffs further allege Pape sold B&N the subject vehicle.  (Id. at ¶¶ 19, 21.)  The subject vehicle and CNG System were brand new at the time of the incident.  (Id. at ¶ 22.)  B&N made one payment to Pape Trucks, that included the cost of the subject vehicle and the CNG system.  (Id. at ¶ 21.)  Plaintiffs also allege B&N purchased a second Kenworth tractor ("sister vehicle"), which was outfitted with the same Momentum-designed and manufactured natural gas fueling system and Carleton-designed cylinders concurrently with the subject vehicle.  (Id. at ¶ 29.)

On the date of the incident, William was fueling the subject vehicle for the very first time at a CNG facility in Buttonwillow, California.  (Id. at ¶ 23.)  While fueling, all four cylinders were filled simultaneously.  (Id. at ¶ 27.)  At that time, Plaintiffs allege that one of the cylinders

---

[4] The Court notes all allegations and claims asserted against Carleton were also asserted against Defendant Cobham PLC, which was voluntarily dismissed on August 30, 2019.  (ECF Nos. 51, 52.)

located behind the passenger cabin (the "Subject Cylinder") ruptured.  (Id. at ¶ 23.)  A "catastrophic" release of pressure occurred, causing a shock wave to emanate outward.  (Id. at ¶ 24.)  The shock wave caused portions of the subject vehicle and CNG System to fly hundreds of feet in every direction, the subject vehicle was destroyed and the surrounding CNG fueling facility sustained major structural damage.  (Id. at ¶ 26.)  Plaintiffs allege the cylinders were not fully filled and therefore had not yet reached capacity at the time of rupture.  (Id. at ¶ 28.)

William was standing within a few feet of the CNG System and subject cylinder at the time of the rupture and was severely injured.  (Id. at ¶ 25.)  William sustained personal injuries including brain damage and multiple fractures.  (Id.)

Plaintiff B&N brings this action based upon economic losses, including lost profits, sustained as a result of both specialized tractors—the subject vehicle and the sister vehicle—becoming unusable as a result of the incident.[5]  (Id. at ¶ 4.)

Plaintiffs William and B&N assert causes of action against Defendants Momentum, Carleton, and Pape for: (1) strict products liability–manufacturing/design defect; (2) strict products liability–failure to warn; (3) negligent products liability; (4) breach of implied warranty of merchantability; and (5) general negligence (id. at ¶¶ 31–69); they assert cause of action (6) against Momentum for negligent hiring, training and/or supervision (id. at ¶¶ 70–77); and William's wife, Joan ("Joan"), asserts cause of action (7) against Momentum, Carleton, and Pape for loss of consortium damages she sustained resulting from William's injuries (id. at ¶¶ 3, 78–82).

**B.	Defendant Carleton's Answer and Crossclaim**

On April 19, 2019, Defendant Carleton answered the FAC.  (ECF No. 22.)  Carleton admits it designed and manufactured the cylinders used in the CNG System, including the cylinder that ruptured/exploded, but that it did so pursuant to Momentum's requirements.  (Id. at 4.)

Carleton asserts crossclaims against Momentum and Pape for: (1) indemnity and

---

[5] Plaintiffs allege that the sister vehicle was also intended to be utilized in conducting B&N Trucking's business in the foreseeable future, but that it was deemed unusable as a result of the December 21, 2018 incident.  (Id. at ¶ 30.)

contribution; and (2) declaratory relief.  (Id. at 18–20.)

On May 16, 2019, Momentum answered Carleton's crossclaim.  (ECF No. 34.)  Pape did not file an answer to Carleton's crossclaim.

### C.    Momentum's Answer and Crossclaim

On April 23, 2019, Momentum answered the FAC.  (ECF No. 28.)  Momentum admits that it manufactures a variety of compressed natural gas fuel storage system configurations which integrate with multiple body "OEMs," that it designed and manufactured the CNG fuel storage system (minus the carbon fiber cylinders) installed on the subject vehicle, and that it contracted with Carleton to manufacture the carbon fiber cylinders used in the CNG fuel storage system installed on the subject vehicle.  (Id. at 3, 5, 7.)

Momentum asserts a crossclaim against Carleton for: (1) express indemnity; (2) breach of contract; (3) total equitable indemnity; (4) contribution; and (5) declaratory relief.  (Id. at 25–29.)

On May 14, 2019, Carleton answered Momentum's crossclaim.  (ECF No. 33.)

### D.    Pape's Answer and Crossclaim

On May 20, 2019, Pape answered the FAC.  (ECF No. 36.)  Pape denies that it was a designer, manufacturer, or installer of the CNG System and subject cylinder.  (Id. at 6.)

Further, Pape brings a crossclaim against Defendants Carleton (Cobham) and Momentum on the basis that, should liability be established, any and all damages are the result of the actions of Momentum and Carleton.  (Id. at 15–19.)  Pape asserts crossclaims against Momentum and Carleton for (1) total equitable indemnity; (2) contribution; (3) negligence (regarding the design, construction, installation and distribution of the CNG system sold to Pape and installed in the vehicles sold to B&N); and (4) declaratory relief.  (Id. at 16–18.)

On June 10, 2019, Carleton and Momentum each answered Pape's crossclaim.  (ECF Nos. 39, 40.)

### E.    Markel's Intervenor's Complaint

On November 12, 2019, Markel filed a motion to intervene as subrogee of American Natural Gas, LLC (the owner of the gas station at which the incident occurred).  (ECF No. 53.) Markle alleges it is subrogee of American Natural Gas, LLC ("American," or the "Insured"),

1   which owned the gas station (the "subject property") at which the incident occurred.  (Intervenor

2   Compl. ¶¶ 4–5, ECF No. 69.)  American was insured by Markle at the time of the incident.  (<u>Id.</u> at

3   ¶ 6.)  The cylinder rupture/explosion that is the subject of the instant lawsuit caused substantial

4   damage to the Insured's property, which required Markle to pay policy benefits in the amount of

5   $498,921.33.  (<u>Id.</u> at ¶ 22.)  Markle asserts the following causes of action on behalf of the Insured

6   against Defendants Momentum, Carleton, and Pape Trucks: (1) negligence; (2) strict productions

7   liability–manufacturing defect; (3) strict products liability–design defect; and (4) strict products

8   liability–failure to warn.  (<u>Id.</u> at ¶¶ 23–51.)  Markle seeks to recover damages in the amount of

9   policy benefits paid to the Insured ($498,921.33) as a result of the subject incident.  (<u>Id.</u> at 9.)

10      Pape Trucks, Momentum, Plaintiffs, and Carleton all filed statements of non-opposition to

11   Markel's motion to intervene.  (ECF Nos. 54, 57, 58, 59.) The Court granted Markel's motion on

12   June 3, 2020 (ECF No. 68); on June 5, 2020, Markel filed its intervenor complaint against all

13   Defendants.  (ECF No. 69.)

14      On June 26, 2020 and July 9, 2020, respectively, Pape and Momentum answered the

15   complaint in intervention.  (ECF Nos. 70, 71.)  Carleton did not file an answer to the intervenor

16   complaint.

17          **F.      Pape's Motion for Summary Judgment**

18      On June 1, 2023, Pape filed the instant motion for summary judgment.  (ECF No. 106.)

19   The motion addresses the issue of whether Pape can be held jointly and severally liable to

20   Plaintiffs, or liable in contribution or indemnification to any other party under a strict products

21   liability theory based on California law.  Thus, Pape seeks summary adjudication as to Plaintiffs

22   and Intervenor Markle's strict products liability claims and Defendant/Cross-Defendant/Cross-

23   Plaintiff Carleton's strict products liability crossclaims.  (<u>See id.</u> at 9.)

24      On June 15, 2023, oppositions were filed by Plaintiffs (ECF No. 107); Carleton (ECF No.

25   108); and Markel (ECF No. 109).  In addition to objecting to and disputing certain facts in their

26   response to Pape's statement of undisputed facts (<u>see</u> ECF No. 107-1 at 1–45), Plaintiffs also

27   submitted a statement of disputed facts in support of their opposition to summary judgment (Pls.'

28   statement of disputed facts ("Pls-SDF"), ECF No. 107-1 at 45–55).

On June 26, 2023, Pape filed a reply brief.  (ECF No. 111.)  Pape did not file any response to Plaintiffs' statement of disputed facts, or otherwise dispute or object to the facts asserted therein.  (See id.)

On June 27, 2023, the parties stipulated for the motion for summary judgment to be heard and decided by U.S. Magistrate Judge Stanley A. Boone.  (ECF No. 112.)  The district judge assigned this matter to the Magistrate Judge for final disposition the same day.  (ECF No. 113.)

On July 19, 2023, the parties appeared for the hearing on the motion, as previously detailed.  (See ECF No. 115.)  The matter was deemed submitted.

### III.

### LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp. (Matsushita), 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when the moving party demonstrates no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues but not as to others, or as to some parties, but not as to others."  Conte v. Jakks Pac., Inc., 981 F. Supp. 2d 895, 902 (E.D. Cal. 2013) (quoting Barker v. Norman, 651 F.2d 1107, 1123 (5th Cir. 1981)); see also Robi v. Five Platters, Inc., 918 F.2d 1439 (9th Cir. 1990); Cheng v. Comm'r Internal Revenue Serv., 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial."  First Nat'l Ins. Co. v. F.D.I.C., 977 F. Supp. 1051, 1055 (S.D. Cal. 1977).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett (Celotex), 477 U.S. 317, 323 (1986).  To carry its burden of

production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc. (Nissan Fire), 210 F.3d 1099, 1102 (9th Cir. 2000). "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Nissan Fire, 210 F.3d at 1102–03; see Adickes, 398 U.S. at 160. If, however, a moving party carries its burden of production, the burden then shifts to the nonmoving party to establish that a genuine issue as to any material fact actually does exist. Matsushita, 475 U.S. at 585–87.

In the endeavor to establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor but need only show the claimed factual dispute "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288–89 (1968). Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Similarly, the nonmoving party may not merely rely upon the mere allegations or denials of its pleadings or "show that there is some metaphysical doubt as to the material facts," but must instead tender evidence of specific facts in the form of affidavits and/or admissible discovery material, in support of its contention that the dispute exists. Matsushita, 475 U.S. at 586; Est. of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(c), (e)). Finally, the nonmoving party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 251–52.

In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305–06 (9th Cir.

1982).   In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (citation omitted).  The evidence of the nonmoving party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the nonmoving party.  Anderson, 477 U.S. at 255; Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011). Thus, the Court determines only whether there is a genuine issue for trial.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (citations omitted).  Nevertheless, mere disagreement as to legal implications of the material facts does not bar summary judgment.  See Beard v. Banks, 548 U.S. 521, 530 (2006).  Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251–52.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  Nissan Fire, 210 F.3d at 1103; see also Celotex, 477 U.S. at 322.

In arriving at this order, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties, the arguments presented at the July 19, 2023 hearing, as well as the Court's file.  Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection.  This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**IV.**

**DISCUSSION**

Pape argues evaluation of the policy factors set forth in Bay Summit Community Association v. Shell Oil Company, 51 Cal. App. 4th 762 (1996), demonstrates it was not in the stream of commerce for purposes of strict liability.  Further, Pape argues public policy considerations do not support imposition of strict liability.  Accordingly, Pape seeks summary judgment as to the strict liability claims asserted against it by Plaintiffs, Carleton, and Markel in

1    the FAC and crossclaims.[6]

2        **A.    Strict Liability/Stream of Commerce**

3        The California Supreme Court established the doctrine of strict products liability in

4    Greenman v. Yuba Power Products, Inc., when it held "[a] manufacturer is strictly liable in tort

5    when an article he places on the market, knowing that it is to be used without inspection for

6    defects, proves to have a defect that causes injury to a human being."  Greenman, 59 Cal.2d 57,

7    62 (1963).  In Vandermark v. Ford Motor Co., the California Supreme Court extended the

8    doctrine to retailers, reasoning

9            Retailers like manufacturers are engaged in the business of
10           distributing goods to the public.  They are an integral part of the
             overall producing and marketing enterprise that should bear the cost
11           of injuries resulting from defective products.  In some cases the
             retailer may be the only member of that enterprise reasonably
12           available to the injured plaintiff.  In other cases the retailer himself
             may play a substantial part in insuring that the product is safe or
13           may be in a position to exert pressure on the manufacturer to that
             end; the retailer's strict liability thus serves as an added incentive to
14           safety.  Strict liability on the manufacturer and retailer alike affords
             maximum protection to the injured plaintiff and works no injustice
15           to the defendants, for they can adjust the costs of such protection
             between them in the course of their continuing business
16           relationship.

17   Vandemark, 61 Cal.2d 256, 262–63 (1964) (internal citations omitted).

18       Following these cases, courts have applied strict liability to those involved "in the vertical

19   distribution of consumer goods, including lessors of personal property, developers of mass-

20   produced homes, wholesale and retail distributors, and licensors," reasoning that "although these

21   defendants were not necessarily involved in the manufacture or design of the final product, each

22   was responsible for passing the product down the line to the consumer."  Bay Summit, 51 Cal.

23   App. 4th at 773 (internal citations omitted).  Liability of all such defendants is joint and several.

24   Loomis v. Amazon.com LLC, 63 Cal. App. 5th 466, 477 (2021) (citation omitted).

25       California courts may also extend the doctrine of strict liability to parties who were not in

26   the actual vertical distribution chain.  See Bay Summit, 51 Cal. App. 4th at 773.  Doing so,

27   ────────────────

28   [6] The Court notes that, in limiting its summary judgment motion to the strict liability claims, Pape does not challenge
     other claims asserted against it by the parties, such as Plaintiffs' negligence claims.

however, must be consistent with public policies such as enhancing product safety, maximizing protection to the injured plaintiff, and apportioning costs among the defendants.  See Arriaga v. CitiCapital Commercial Corp., 167 Cal. App. 4th 1527, 1535 (2008).  Where such policies are satisfied, and an entity "is instrumental in placing a defective product … into the stream of commerce, then liability [should] attach[] without regard to conduct (fault)."  Bay Summit, 51 Cal. App. 4th at 773.

Under this "stream of commerce" theory, courts focus on the actual connection between the defendant's activities and the defective product.  Id.  at 774 (citations omitted).  In Bay Summit, the court set forth three factors to determine whether "the facts establish a sufficient causative relationship or connection between the defendant and the product so as to establish that the policies underlying the strict liability doctrine are satisfied": (1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process.  Id. at 776.

## B.    Analysis

No party disputes that the explosion of the subject truck occurred due to a defective product.  Rather, Pape moves for summary judgment on all strict liability claims asserted against it on the basis that the public policy considerations underlying strict liability are not met here, and that liability, therefore, may not be imposed under stream of commerce or chain of distribution theories.  (ECF No. 106 at 9, 13–15.)  Moreover, Pape argues it should not be considered to be in the stream of commerce for the subject fuel system because the Bay Summit factors are not met.  (ECF No. 106 at 9–11 (citing Petitpas v. Ford Motor Co., 13 Cal. App. 5th 261, 266 (2017)).)

Plaintiffs, Markel, and Carleton oppose the motion,[7] arguing that Pape is not a mere

---

[7] The Court notes the oppositional briefs, statements of disputed and undisputed facts, and evidentiary support submitted by Plaintiffs and Markel are essentially identical.  Carleton joins Plaintiffs' opposition.  Accordingly, the Court may refer at times to an individual opposing party's arguments, as appropriate, but will generally refer to Plaintiffs, Markel, and Carleton as the "opposing parties," and reference the oppositional arguments as cited in Plaintiffs' briefing.  Further, Carleton proffers the additional argument that Pape is not entitled to summary judgment with respect to the claims Carleton asserts against it because Carleton does not assert any strict liability claims against Pape Trucks.  Pape acknowledges this fact in its reply briefing and appears to concede this argument.  (ECF

1    "passthrough" party with a tangential or attenuated connection to the defective product, but a

2    retailer and seller of the subject truck and therefore a direct link in the distribution chain for strict

3    liability purposes.  (ECF No. 107 at 8–12; ECF No. 109 at 7–11 (citing Vandermark, 61 Cal.2d at

4    256).)  As such, the opposing parties argue the general rule—that there is strict joint and several

5    liability for every entity in the chain of distribution—applies here, and that Pape does not fall into

6    one of the limited exceptions of "new or novel territory" which require consideration of public

7    policies under the stream of commerce theory.  (ECF No. 107 at 14–15; ECF No. 109 at 12–14.)

8          In reply, Pape argues the Bay Summit and Vandermark policy factors do not only apply to

9    "new and novel" cases; but in any event, the facts of this care are unique.  (ECF No. 111 at 9–11.)

10   Further, Pape argues only the Momentum fuel system, and not the subject truck itself, is the

11   alleged defective product, and the opposing parties have not presented any evidence that Pape did

12   or failed to do anything to cause damage to the subject cylinder before it ruptured.  (Id. at 7–8,

13   12–14.)

14         1.    Whether Bay Summit Factors Apply to this Case

15         As an initial matter, the Court addresses the parties' dispute as to which legal standard is

16   to be applied to the circumstances of the instant case and whether the policy factors set forth in

17   Bay Summit must always be evaluated, as Pape contends.  Here, the Court finds the opposing

18   parties have the better argument.

19         As previously noted, the California Supreme Court held manufacturers are strictly liable

20   for a defective product placed on the market that causes injury to a consumer.  Greenman, 59

21   Cal.2d at 62.  In establishing the doctrine of strict liability, the court explained "[t]he purpose of

22   such liability is to insure that the costs of injuries resulting from defective products are borne by

23   the manufacturers that put such products on the market rather than by the injured persons who are

24   powerless to protect themselves," id. at 63, and concluded that, "[t]o establish the manufacturer's

25   liability it was sufficient that plaintiff proved that he was injured while using the [product] in a

26   way it was intended to be used [and was injured] as a result of a defect in design and manufacture

27   

28   No. 111 at 5 n.1.)  Therefore, to the extent Pape moved for summary judgment against Carleton (see ECF No. 106 at 1–2, 5), such motion shall be denied as moot.

of which plaintiff was not aware that made the [product] unsafe for its intended use," id. at 64.

The California Supreme Court extended the doctrine to include retailers and anyone identifiable as "an integral part of the overall producing and marketing enterprise" in Vandermark. 61 Cal.2d at 262. In Vandermark, the plaintiffs purchased a new Ford motor vehicle from defendant Maywood Bell Ford, an authorized Ford dealership, and shortly thereafter sustained serious injuries resulting from a vehicle collision. Id. at 258–59. Prior to the accident, the plaintiffs took the car to Maywood for the regular 1,000-mile new car servicing. Id. at 259. Experts and circumstantial evidence indicated the collision was caused by a defective piston in the master cylinder or braking system resulting from negligence in the design, manufacture, assembly, and/or adjustment of the vehicle. Id. at 259–60. Because the damage to the vehicle precluded determining whether or not the master cylinder assembly had been properly installed and adjusted before the accident, the court held the circumstantial evidence was admissible for purposes of establishing the existence of a defect and the defendants' responsibility. Id. at 260. Ford sought dismissal from the action, on the basis that there was no proof that the car was defective at the time Ford relinquished control over it. Id. The Supreme Court rejected this argument. Id. Elaborating on its ruling in Greenman, the court explained that Ford, the manufacturer, was strictly liable for the braking defects that caused the accident in this case:

> Since the liability is strict it encompasses defects regardless of their source, and therefore a manufacturer of a completed product cannot escape liability by tracing the defect to a component part supplied by another … Moreover, even before such strict liability was recognized, the manufacturer of a completed product was subject to vicarious liability for the negligence of his suppliers or subcontractors that resulted in defects in the completed product … These rules focus responsibility for defects, whether negligently or nonnegligently caused, on the manufacturer of the completed product, and they apply regardless of what part of the manufacturing process the manufacturer chooses to delegate to third parties. It appears in the present case that Ford delegates the final steps in that process to its authorized dealers. It does not deliver cars to its dealers that are ready to be driven away by the ultimate purchasers but relies on its dealers to make the final inspections, corrections, and adjustments necessary to make the cars ready for use. Since Ford, as the manufacturer of the completed product, cannot delegate its duty to have its cars delivered to the ultimate purchaser free from dangerous defects, it cannot escape liability on the ground that the defect in Vandermark's car may have been caused by something one of its

1   authorized dealers did or failed to do.

2   Id. at 261 (internal citations omitted, emphasis added).   Furthermore, the court found the

3   dealership Maywood Bell Ford was also strictly liable because it sold the completed vehicle to the

4   plaintiffs.  Id. at 261–62.  In extending strict liability to retailers (here, the dealership Maywood

5   Bell Ford), the court explained

6   Retailers like manufacturers are engaged in the business of
    distributing goods to the public.  They are an integral part of the
7   overall producing and marketing enterprise that should bear the cost
    of injuries resulting from defective products … In some cases the
8   retailer may be the only member of that enterprise reasonably
    available to the injured plaintiff.  In other cases the retailer himself
9   may play a substantial part in insuring that the product is safe or
    may be in a position to exert pressure on the manufacturer to that
10  end; the retailer's strict liability thus serves as an added incentive to
    safety.  Strict liability on the manufacturer and retailer alike affords
11  maximum protection to the injured plaintiff and works no injustice
    to the defendants, for they can adjust the costs of such protection
12  between them in the course of their continuing business
    relationship.  Accordingly, as a retailer engaged in the business of
13  distributing goods to the public, Maywood Bell is strictly liable in
    tort for personal injuries caused by defects in cars sold by it.

14

15  Id. at 262–63.  Finally, in holding the retailer strictly liable, the Vandermark court explained that,

16  regardless of the contractual obligations or restrictions of liability that exist between the

17  manufacturer and retailer, the retailer is subject to strict liability in tort "because it is in the

18  business of selling automobiles, one of which proved to be defective and caused injury to human

19  beings."  Id. at 263.

20      Importantly, the California Supreme Court did not identify any policy factors that must be

21  analyzed in order for strict liability to apply under the general doctrine of strict liability.  Rather,

22  once it is established that a party is in the vertical distribution chain of the defective completed

23  product that caused harm to a consumer, strict liability attaches.  Certainly, the court discussed its

24  reasons for extending the new doctrine of strict liability to retailers in Vandermark, reasons which

25  are rooted in public policy.  See, generally, id.  However, there is no indication in Vandermark, or

26  subsequent strict liability cases, that the public policies discussed by the court were meant to

27  create a new test or additional factors required to establish strict liability against a party within the

28  vertical chain of distribution.  Nor has Pape identified any California case which applies these so-

called "Vandermark policy factors" to establish strict liability against such a party.

Instead, the California Appellate Court in Bay Summit (and subsequent California cases) established a public policy-based factor test to be applied when a consumer sought to expand the strict liability doctrine to a party not within the vertical chain of distribution of the defective product.  See, generally, Bay Summit, 51 Cal. App. 4th 762.  This is the basis of the so-called "stream of commerce" or "marketing enterprise" theory.

In Bay Summit, the plaintiffs (the Bay Summit Community Association and several individual homeowners) sued multiple parties relating to plumbing leaks that developed in a condominium development due to defective fittings used in a polybutylene plumbing system. The polybutylene plumbing system consisted of several parts—polybutylene pipes, T-shaped plastic fittings, metal rings, and installation tools; the pipes were made from polybutylene resin, whereas the fittings were made from a plastic material "Celcon."  Id. at 767–68.  Defendants included the condominium developer (Bay Summit), the polybutylene plumbing manufacturer (United States Brass Corporation), and the supplier of resin for the polybutylene pipes (Shell Oil Company).  Id. at 766.

Importantly, it was undisputed that Shell was not technically within the vertical chain of distribution of the defective product, as it did not design, manufacture, or sell the defective plumbing fittings that caused the leaks.  See id. at 771.  Further, the plaintiffs did not present any evidence of a defect in Shell's resin or even that Shell's resin was used in the defective fittings. Instead, the plaintiffs presented evidence that Shell played a prominent role in the marketing of polybutylene pipes and the polybutylene plumbing system for new homes, including providing substantial marketing assistance to polybutylene plumbing system manufacturers.  Id. at 769.  The purpose of assisting with such marketing was to create a market for polybutylene plumbing systems that would, in turn, seek application of Shell's resin product for the pipes in the system. See id. at 769–71.  Further, Shell was aware that the Celcon fittings were defective, but failed to disclose the defects.  Id. at 768.  Thus, the plaintiffs argued Shell was strictly liable based on its extensive involvement in the marketing of the polybutylene plumbing system.  See id. at 771.  As relevant here, the trial court accepted the plaintiffs' argument, and the jury found Shell strictly

liable.  Shell appealed this verdict, on the basis that it was merely an "upstream" supplier of a non-defective raw material/component part of the product (the resin), and was therefore not within the chain of distribution for purposes of the strict liability claim.  See id. at 766–67.

The appellate court, however, rejected Shell's argument as flawed.  Id. at 771–72.  While it did not expressly confirm that Shell was outside of the vertical chain of distribution, it explained that Shell was not being sued as strictly liable solely for its role as supplier of the resin, but also as promoter of the completed polybutylene plumbing system.  Id. at 772.  Thus, the issue was whether Shell should be held strictly liable under circumstances in which Shell "suppl[ied] the nondefective resin, *in combination with Shell's marketing activities*."  Id. (emphasis in original).  Further, because the focus of the stream of commerce theory is the connection between the defendant's activities and the defective product, such defendant need not have actual possession of the defective product or control over the manner in which the product was designed or manufactured; nor is the defendant's legal status or formal relationship with the manufacturer or the consumer dispositive.  Id. at 773.  Finally, under the stream of commerce theory, the Bay Summit court articulated the aforementioned policy factors that must be satisfied for strict liability to attach; these factors focus on the actual connection between the defendant's activities and the defective product.[8]  See id. at 774–76.

In sum, the Bay Summit court extended the strict liability doctrine to nonmanufacturing parties outside the vertical chain of distribution of a product, where such parties played "an integral role in the 'producing and marketing enterprise' of a defective product and profited from placing the product into the "stream of commerce."  Id. at 773.  Establishing strict liability based on the "stream of commerce" or "marketing enterprise" theory requires satisfaction of the three aforementioned policy factors, (1) the defendant received a direct financial benefit from its activities and from the sale of the product, (2) the defendant's role was integral to the business

---

[8] The Court additionally notes that the Bay Summit court found the plaintiffs' evidence satisfied each of the factors as to Shell.  Id. at 777.  Therefore, the court rejected Shell's contention that, as a matter of law, it could not be held strictly liable for defects in the polybutylene plumbing system.  Id.  Ultimately, however, because the trial court did not issue jury instructions as to the stream of commerce factors and there was conflicting evidence regarding Shell's role in the manufacturing and distribution process, the appellate court reversed the judgments on the plaintiffs' strict liability claims against Shell.  Id. at 778–79.

enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market, and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process.  Id. at 776.

There is no indication in <u>Bay Summit</u> (or its progeny), however, that the identified policy factors are meant to be applied to strict liability cases in which the defendant plainly falls within the vertical chain of distribution.  See <u>Arriaga</u>, 167 Cal. App. 4th at 1527 (explaining "[s]trict liability also applies where a nonmanufacturing party is outside the vertical chain of distribution of the product, but plays an integral role in the producing and marketing enterprise of a defective product and profit[s] from placing the product into the stream of commerce.") (internal quotations and citation omitted).  Indeed, in all of the cases upon which Pape relies for application of the <u>Bay Summit</u> policy factors, the purported defendant was outside of the vertical chain of distribution.  See, e.g., <u>Bruce v. Clark Equip. Co.</u>, No. CIV S-05-01766 WBS KJM, 2008 WL 912927 (E.D. Cal. Mar. 26, 2008) (declining to extend strict liability under stream of commerce theory to defendant corporate shareholder of the company responsible for the design, assembly, manufacture and sale of the defective product); <u>Fortman v. Hemco, Inc.</u>, 211 Cal. App. 3d 241 (1989) (finding strict liability applied under stream of commerce theory against defendant maker/designer of the mold from which fiberglass custom car body top, including defective car door, was made); <u>Arriaga</u>, 167 Cal. App. 4th at 1527 (declining to extend strict liability under stream of commerce theory to defendant finance lessor and seller of glue spreading machine, who never came into contact with product but only executed the financial lease).

Therefore, under <u>Vandermark</u>, the first question that must be addressed in determining whether strict liability attaches to a defendant is whether that defendant was within the vertical chain of distribution of the defective product that harmed the plaintiff-consumer.  If this question is answered in the affirmative, the inquiry proceeds under the <u>Greenman</u>/<u>Vandermark</u> requirements—i.e., an article is placed on the market, that is to be used without inspection for defects, and it proves to have a defect that causes injury to a human being—and the <u>Bay Summit</u> policy factors need not be evaluated to determine strict liability.  If the defendant is not a manufacturer or within the vertical chain of distribution, however, the court must turn to the <u>Bay</u>

<u>Summit</u> policy factors to determine whether the defendant nonetheless played "an integral role in the 'producing and marketing enterprise' of a defective product and profited from placing the product into the "stream of commerce," <u>Bay Summit</u>, 51 Cal. App. 4th at 773, such that the interests of the public are best served by imputing strict liability.  Pape's argument to the contrary is therefore unavailing.

### 2.   Whether Pape is a "Retailer" is a Disputed Issue of Material Fact

At the hearing on the motion, Pape acknowledged the chain of distribution rule set forth in <u>Vandermark</u>.   It also acknowledged that "technically," it would fall within the chain of distribution of the subject truck as a retailer.  However, Pape argues that it falls within a narrower category of special circumstances—specifically, the attenuated connection between Pape and the subject fuel system—therefore, the <u>Bay Summit</u> factors should be applied.  Further, Pape argues that, under the <u>Bay Summit</u> factors, it should not be held strictly liable because, like the analogous defendant in <u>Petitpas v. Ford Motor Co.</u>, Pape's actions occurred outside of the "stream of commerce."  (ECF No. 106 at 9–11 (citing <u>Petitpas</u>, 13 Cal. App. 5th 261).)

Again, the Court disagrees.  For the foregoing reasons, the test for strict liability set forth in <u>Greenman</u>, as expanded to retailers by <u>Vandermark</u>, requires establishing the following for strict liability to attach: (1) a product (2) that is to be used without inspection for defects is (3) placed on the market (4) by someone within the chain of distribution (including manufacturers and retailers), and (5) the product proves to have a defect (6) causes harm to the consumer. <u>Greenman</u>, 59 Cal.2d at 62; <u>Vandermark</u>, 61 Cal.2d at 206–61.  The <u>Bay Summit</u> factors, by contrast, are applied to establish whether to apply strict liability to defendants who are neither involved in the manufacture or design of the final product, nor fall within this chain of distribution.

Pape concedes it is a retailer in the sense that it sold the subject truck (inclusive of the subject fuel system) to B&N.  <u>Vandermark's</u> test for strict liability therefore applies, and the Court need not reach the <u>Bay Summit</u> policy factor analysis.[9]  Furthermore, as previously noted,

---

[9] Indeed, Pape's situation is almost directly analogous to that of the defendant truck dealership in <u>Vandermark</u> (Maywood Bell Ford), which was held strictly liable "because it is in the business of selling automobiles, one of which proved to be defective and caused injury to human beings."  <u>Vandermark</u>, 61 Cal.2d at 261–63.  Like

1  the cases cited by Pape are factually inapposite, as they applied the stream of

2  commerce/marketing enterprise analysis to defendants who were clearly outside of the vertical

3  chain of distribution.[10]  Pape's argument that it lacks a "sufficient connection" to the defective

4  fuel system under the <u>Bay Summit</u> factors presupposes that such factors govern this case and is

5  therefore unavailing.

6      Furthermore, Pape's attempts to redefine and narrow the definition of "retailer," thus

7  limiting the scope of strict liability to the defective subject fuel system rather than the subject

8  truck as a completed product, are unavailing.  First, Pape asserts the defect was limited to the

9  subject fuel system (<u>see</u> Pape's statement of undisputed facts ("PT-SUF") ¶ 96, ECF No. 106-3);

10 however, the opposing parties object to and dispute this fact by submitting evidence of Pape

11 employees' involvement with the installation (and inspection) of the subject fuel system onto the

12 subject truck.  (<u>See</u> ECF No. 107-1 ¶ 96 (opposing parties indicate that whether the installation

13 process itself could not have created a defect that caused or contributed to the fuel system rupture

14 is the proper subject of expert and not lay testimony); <u>see also</u> PT-SUF ¶ 83 (noting Pape did not

15 have any experience with installing CNG systems); <u>see also</u> Pls-SDF ¶¶ 2–8.)  The supplemental

16 evidence Plaintiffs submit in support of their opposition (Pls-SDF ¶¶ 2–8)—which Pape does not

17 directly address in its reply[11]—raises a triable issue as to whether Pape's involvement in the

18 _____

19 Maywood Bell Ford, which sold the completed vehicle to the plaintiffs, Pape sold the completed subject truck to
   B&N.  Also in <u>Vandermark</u>, the court concluded the damage to the vehicle prevented it from determining whether or
20 not the master cylinder assembly had been properly installed and adjusted by Maywood before the accident;
   therefore, it could not determine whether the vehicle was defective at the time Ford relinquished control of it to
21 Maywood, or if the defect in the vehicle was created during the installation of the component part.  Similarly here,
   the opposing parties have raised a triable issue of fact for summary judgment purposes as to whether Pape's
22 involvement in the installation of the subject fuel system contributed to the defectiveness of the completed product,
   which is discussed in greater detail herein.

23 [10] In fact, the Court notes that <u>Bay Summit</u> is inapposite to the instant case in some crucial respects.  Perhaps most
   importantly, in <u>Bay Summit</u>, Shell argued it was merely an "upstream" supplier of a non-defective raw
24 material/component part of the product (the resin), and was therefore not within the chain of distribution for purposes
   of the strict liability claim.  <u>See Bay Summit</u>, 51 Cal. App. 4th at 766–67.  Pape, by contrast, was not an "upstream"
25 supplier of a *component part*; it was the retail seller of the *completed product*, *i.e.*, the commercial truck.  That is,
   unlike Shell—which only supplied the non-defective resin that was later used to coat the defective polybutylene pipes
26 in the defective plumbing systems, but bore no involvement in creating the finished plumbing systems—Pape
   purchased the subject fuel system and it was installed onto its commercial vehicle on Pape's property, such that the
27 completed product that it sold to B&N was defective at the time the subject truck left Pape's lot.

28 [11] Pape does discuss the expert testimony of Dr. Devinder Grewal and references statements purportedly made in his
   deposition which support Pape's contention that Pape employees did not damage the subject cylinder of the

installation and inspection process contributed in any way to the defect in the subject fuel system that caused the explosion.

Regardless, B&N did not merely contract Pape's services to install the subject fuel system onto the subject truck, nor did B&N solely purchase the subject fuel system from Pape Trucks. Rather, B&N purchased the subject truck with a Momentum fuel system installed on it.  (See PT-SUF ¶ 100.)  Thus, the subject fuel system was a component part that was installed onto the subject truck; that is, the completed product that Pape ultimately sold to B&N, which B&N ultimately drove off of Pape's premises, was a commercial truck installed with a CNG fuel system.  The California Supreme Court explained that strict liability encompasses all injures caused by a defective product, even those traceable to a defective component part that was supplied by another.  Vandermark, 61 Cal.2d at 261.  As noted in further detail herein, Pape does not cite any on-point legal authority for its argument to the contrary.

Pape's attempt to essentially redefine the term "retailer" for strict liability purposes also fails.  Pape argues it is not a "retailer" with respect to the subject fuel system because it did not affix or charge a retail markup to the price of the Momentum fuel systems installed on the subject and sister trucks, but instead acted as a "passthrough" from Momentum to B&N as to cost.  (PT-SUF ¶ 82.)  This factual assertion, however, is disputed extensively by the opposing parties.  As noted by the opposing parties, Pape did not merely charge B&N an installation service charge for installing the subject fuel system onto the subject truck and the fuel system part "at cost"; rather, it charged a total price of $217,973.58, which was inclusive of the sale of the truck cab without the fuel system ($125,719.00), plus the component fuel system ($52,469.00), a document fee, and federal and state taxes and license fees, less $100,000.00 which was covered by a state grant.  (ECF No. 107-1 ¶ 82; Jerrad Dep., Ex. 10, ECF No. 107-4 at 1–52.)  On this record, reasonable jurors could conclude that the purpose of the transaction between Pape and B&N was the sale of a

---

Momentum fuel system during installation so as to cause it to become defective and rupture.  (See ECF No. 111 at 13–14.)  However, Pape does not attach the relevant pages of the deposition transcript to its reply briefing—indeed, a supporting declaration of counsel indicates that Dr. Grewal was not deposed until June 21, 2023, i.e., after the June 15, 2023 filings of the oppositions to summary judgment, and that the transcript of Dr. Grewal's deposition was not available to any party prior to the filing of the reply brief (see ECF No. 111-1 at ¶ 2).  Consequently, the Court cannot verify the accuracy of Pape's representations as to Dr. Grewal's testimony, nor can it conclude the opposing parties had an opportunity to reasonably consider or respond to this newly-submitted evidence.

1   retail commercial truck containing a Momentum fuel system, not just the retail truck, upon which

2   a Momentum fuel system was incidentally installed.  See Anderson, 477 U.S. at 251–52.

3          Pape also appears to argue it is not a traditional "retailer" because the transaction with

4   B&N for the sale of the subject truck and sister truck was a one-time incident.  (See PT-SUF ¶

5   77.)  However, Pape's "one-time" argument is unsupported by any on-point legal authority, and

6   this Court declines to carve such a distinction out of California strict liability tort law at this

7   time.[12]  The Restatement of Torts is further instructive.  As to identifying "sellers of products" to

8   whom strict liability may attach, the Restatement provides:

> (1)  One  who  sells  any  product  in  a  defective  condition
> unreasonably dangerous to the user or consumer or to his property
> is subject  to  liability  for  physical harm  thereby  caused  to  the
> ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product,
> and
>
> (b) it is expected to and does reach the user or consumer without
> substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation
> and sale of his product, and
>
> (b) the user or consumer has not bought the product from or
> entered into any contractual relation with the seller.

19   Restatement (Second) of Torts § 402A (1965).

20          Notably, rather than focusing on sales volume for establishing strict liability against the

21   seller of a product, California courts look to the objectives of the parties.  Hernandezcueva v. E.F.

22   Brady Co., Inc., 233 Cal. App. 4th 249, 258, 260 (2015) ("The propriety of imposing strict

23   liability  on  a  party  that  both  supplies  and  installs  a  defective  component  hinges  on  the

---

[12] Indeed, none of the parties identify legal authority which expressly defines a "retailer" for purposes of the strict liability analysis.  To the extent Pape seeks to redefine this term based on the number of products sold by the defendant company, the Court declines to wade into the murky waters of sales and economics and substitute its own judgment for that of an expert in the field in order to create the new standard Pape proposes.  Nevertheless, for the reasons further discussed herein, even if such a standard applied to retailers, the opposing parties have submitted sufficient evidence in this case to identify a disputed issue as to whether Pape sold other CNG fuel systems and whether it was, in fact, expanding its business to sell such products in greater volume in the future.  For this reason, as well, Pape's argument is unavailing at the summary judgment stage.

1    circumstances of the transaction … When the purchase of a product 'is the primary objective or

2    essence of the transaction, strict liability applies even to those who are mere conduits in

3    distributing the product to the consumer.' "). Here, the circumstances of the transaction are that

4    B&N bought a commercial truck from Pape Trucks. To the extent Pape argues it provided the

5    *service* of installing the subject fuel system rather than *selling* it (see ECF No. 106 at 11–12 (Pape

6    argues it "was never primarily in the business of selling Momentum fuel systems to customers")),

7    the finished product in this situation is the subject truck, and the fuel system was a component

8    part. Indeed, the opposing parties submit evidence that they did not pay merely for a fuel system,

9    but for the entire retail commercial truck. (ECF No. 107-1 ¶ 82; Jerrad Dep., Ex. 10.)

10   Vandermark, therefore, governs the strict liability analysis in this situation.

11          Alternatively, to the extent Pape argues it was not significantly involved in the installation

12   of the fuel system itself (see PT-SUF ¶ 74), this fact is also disputed by the parties. Namely, the

13   opposing parties present evidence that Pape used a checklist described as the "PAPE TEAM" to

14   assist with connecting the fuel connection lines in the subject truck, making electrical connections

15   between the fuel system and the truck, lifting the fuel systems and placing them on the trucks, and

16   drilling holes in the truck frames to secure the fuel system. (See ECF No. 107-1 ¶¶ 74–76; see

17   also Pls-SDF ¶¶ 3–5; Jerrad Dep., Ex. 6; Culberson Dep., 87:5–9, Exs. J, K, ECF No. 107-3;

18   Jimerson Dep., 86:17–20, 87:4–6, ECF No. 107-5.) Opposing parties also present evidence that a

19   checklist titled "Fuel System–Component Final Inspection" indicates the final inspection was

20   completed by Pape's technicians. (Pls-SDF ¶ 5; Culberson Dep., Ex. K.) On December 13,

21   2018, Pape completed a pre-delivery inspection of the subject truck. (Pls-SDF ¶ 43; Clark Decl.,

22   ¶ 12, ECF No. 107-2; Ex. 11, ECF No. 107-13.) Further, the installation occurred at Pape's

23   location. (Pls-SDF ¶ 2; Culberson Dep., 79:22–24.) Jerrad Johnson (of B&N) also testified at

24   deposition that he was merely cc'ed on the email exchanges between Doug Mayes (Pape Trucks)

25   and Shannon Michaels of Momentum ("Michaels"), who were "primarily" handling things. (See

26   ECF No. 107-1 ¶ 80; Jerrad Dep., 39:4–11, 36:18–21.)

27          For similar reasons, the Court finds Petitpas v. Ford Motor Co., the case upon which Pape

28   heavily relies (see ECF No. 106 at 9, 11–13 (header of argument titled "Pape is not in the stream

of commerce for purposes of strict products liability because in a case similar to the instant matter [<u>Petitpas</u>], defendant obtained summary adjudication") (all caps removed)) is also distinguishable from the instant matter.  <u>Petitpas</u> is a case of asbestos exposure, in which the plaintiffs Marline and Joseph <u>Petitpas</u> claimed that first and secondhand exposure to asbestos-containing products caused Marline to develop mesothelioma.  <u>Petitpas</u>, 13 Cal. App. 5th at 266.  As relevant here, the plaintiffs alleged Marline was directly exposed to asbestos-containing dust when she visited Joseph at his job at an Enco service station and from Joseph's work on Ford vehicles at the Enco station, and she was exposed indirectly at home by asbestos-containing dust emanating from Joseph's work-clothes.  <u>Id.</u> at 267.  The plaintiffs sued multiple defendants, including Exxon Mobil Corporation (as owner of the Enco service station at which Joseph worked on vehicles containing component parts that contained asbestos), under theories of negligence, strict liability, and premises liability.  <u>Id.</u> at 266–67.

Exxon challenged the strict products liability claim asserted against it, on the basis that the plaintiffs could not establish Marline was directly or indirectly exposed to asbestos-containing products "manufactured, distributed, or sold by Exxon" because none of the asbestos-containing products were manufactured by Exxon; rather, the asbestos-containing replacement clutches and gaskets Joseph worked with came from an independent auto parts store, and the asbestos-containing replacement brakes with which he worked were supplied by the mobile brake service. <u>Id.</u> at 268.  Further, Exxon argued it only supplied these parts through the provision of automotive services, not as a seller or retailer of parts, and was therefore not within the stream of commerce for automotive parts that may have exposed Marline to asbestos.  <u>Id.</u>  The court agreed with Exxon and affirmed Exxon's summary adjudication as to the strict liability claim.  <u>Id.</u> at 270–71.

Importantly, in affirming the judgment, the appellate court explained that "services, even when provided commercially, are not products" for purposes of the stream of commerce theory of strict products liability, and there was no evidence that Exxon was in the business of selling such products.  <u>Id.</u> at 272.  The court further explained that

> When injury arises from a component integrated in another product, the imposition of strict liability on a party hinges on its role in the relevant transaction.  Generally, manufacturers and suppliers of a

component to be integrated into a final product may be subject to strict liability when the component itself causes harm … On the other hand, parties involved in passing a defective component to the ultimate user or consumer are not subject to strict products liability when their sole contribution to the pertinent transaction was a service, namely, the installation of the component into the pertinent final product … Therefore, the propriety of imposing strict liability on a party that both supplies and installs a defective component hinges on the circumstances of the transaction.

Id. (citing Hernandecueza, 243 Cal. App. 4th at 253–54, 257–60) (internal quotations and citations omitted).  The Petitpas court concluded Exxon was not within the stream of commerce for the asbestos-covered automotive parts because the evidence did not indicate that supplying asbestos-containing gaskets, clutches, and brakes was a central part of the Enco station's business, nor did Exxon have any direct relationship with the parts manufacturers.  Id. at 272–73. Rather, the court noted that if a customer needed a replacement gasket, clutch, etc., the Enco station needed to purchase one that fit the particular make and model of the customer's vehicle; Enco thus had no control over which parts could be used to complete these repairs.  Id. at 274. Finally, the court noted similar cases in which it was concluded that "a mere provider of [installation] services … is not liable for defects in the product."  Id.  (citing Endicott v. Nissan Motor Corp., 73 Cal. App. 3d 917, 930 (1977)).

Pape argues Petitpas is analogous because, like Exxon, Pape "was never primarily in the business of selling Momentum fuel systems to customers," Pape had no significant ongoing relationship with Momentum, and its installation of Momentum fuel systems on its retail trucks is limited to the events of December 2018.  (ECF No. 106 at 11, 12.)  The Court finds this argument still slightly misses the mark.  Again, Pape is not a service provider, but admittedly a retailer of trucks.  Unlike Exxon's Enco station, Pape was not completing repairs on vehicles already owned by the customer and charging for a repair service that happened to include the cost of the defective parts used during the repair; rather, Pape sold brand new retail commercial trucks to B&N, which included installation (and sale) of the defective component part (the subject fuel systems).  The main purpose of the transaction between Pape and B&N, therefore, was not to install a fuel system, but to sell a brand new CNG truck to B&N.  Because Pape submits no evidence to establish it was "a mere provider of [installation] services," Petitpas, 13 Cal. App. 5th

24

1  at 274, its reliance on <u>Petitas</u> and the stream of commerce analysis is unavailing.

2  Based on the foregoing, the Court cannot conclude that Pape has met its burden to

3  establish no rational trier of fact would find that it was not a "retailer" with respect to the

4  circumstances of the December 2018 installation of the subject fuel system and sale of the subject

5  truck to B&N as a matter of law.  On this basis, summary judgment is not warranted.  <u>Matsushita</u>,

6  475 U.S. at 587.

7  　　　　3.　　　Application of the Bay Summit (Stream of Commerce) Policy Factors

8  Furthermore, even if Pape was deemed to not, or only "technically," constitute a "retailer"

9  within the chain of distribution for purposes of strict liability under <u>Vandermark</u>, based on its

10  consideration of the policy factors set forth in <u>Bay Summit</u>, the Court cannot conclude Pape has

11  met its burden to establish there exists no genuine issue of material fact as to Pape's connection

12  (or lack thereof) to Momentum and the subject fuel system.  <u>Matsushita</u>, 475 U.S. at 587.

13  　　　　**a.**　　　**Whether Pape Received a Direct Financial Benefit**

14  Pape argues it did not receive a direct financial benefit from the sale of the Momentum

15  fuel system to B&N.  (ECF No. 106 at 10.)  Pape argues it is not, and never was, a retailer of

16  Momentum fuel systems; that it had no contact with Momentum or its products, and does not

17  have a business relationship with Momentum; and that it "simply acted as a passthrough from

18  Momentum to B&N as to cost" of the Kenworth trucks.  (<u>Id.</u> at 6.)  Thus, Pape argues it is not a

19  retailer of Momentum fuel systems and did not receive a direct financial benefit from its activities

20  and from the sale of the subject vehicle.  (<u>Id.</u>)  The Court finds this argument unpersuasive.

21  As previously discussed, Pape's attempt to limit the scope of the December 2018

22  transaction to the sale of the subject fuel system is unavailing.  For purposes of the strict liability

23  analysis, the "final product" was not the subject fuel system, but the subject truck.  The subject

24  fuel system, therefore, is a component part of the completed product.  Indeed, Plaintiffs submit

25  evidence that B&N was required to use CNG trucks as part of its contract with a third party, and

26  that it would not have purchased a truck from Pape that did not have a CNG fuel system.  (Pls-

27  SDF ¶ 12; Jerrad Dep., 21:21—22:2.)  Thus, Pape was able to complete its retail sale of the

28  subject commercial trucks to B&N *because* it installed the Momentum CNG fuel systems.  But, in

any event, Pape's objective was to sell B&N a truck.  Consequently, Pape received a direct financial benefit from the sale of the subject vehicle, in the total amount of $217,973.58.  (ECF No. 107-1 ¶ 82; Jerrad Dep., Ex. 10.)  Furthermore, the opposing parties present evidence that the subject sale was considered a "pilot" initiative, in consideration of expanding the business into the CNG fuel system industry.  (Pls-SDF ¶ 11; Jimerson Dep., 88:2–8; Culberson Dep., 173:13–16.)  Pape's expert also testified that Jerrad and Pape discussed the installation and considered it to be an opportunity for Pape to "see if it was something that we wanted to do in the future as a—you know, we're looking at growing our business or something."  (PT-SUF ¶ 79.)  This evidence reasonably supports an inference that Pape intended to—and would have, but for the accident that is the subject of the instant lawsuit—become "a retailer of Momentum fuel systems," which calls into question Pape Truck's assertion that its sale of a truck installed with a Momentum fuel system was a "one-time" event.[13]  As conflicting evidence must be viewed in the light most favorable to the nonmoving parties for purposes of summary judgment, the Court cannot conclude Pape has established the first factor weighs in its favor.

### b.      Whether Pape's Role was Integral to the Business Enterprise

Pape argues its conduct was not the impetus in bringing the Momentum fuel system to B&N.  (ECF No. 106 at 10.)  That is, Pape argues it did not introduce Momentum fuel systems to Plaintiffs; rather, Momentum had a pre-existing relationship with B&N and Jerrad, its Vice-President.  (Id. at 7.)  Pape asserts it sold B&N the two Kenworth trucks, but that it was Jerrad's idea and request to install the trucks with Momentum fuel systems, and that such installation was a "one-time deal."  (Id. at 7–8.)  Further, this pre-existing business relationship was the product of Jerrad's trust in Michaels, a Momentum employee, as his "go to" person for CNG fuel systems service.  (Id. at 10.)  The Court finds this argument unpersuasive.

---

[13] Opposing parties also submit evidence that the subject and sister trucks were not the first CNG vehicles B&N purchased from Pape Trucks.  (Pls-SDF ¶ 22; Jimerson Dep., 25:12–13.)  They also submit evidence that Shannon Michaels (of Momentum) worked with Doug Mayes (at Pape Trucks) on "one other occasion" in relation to a CNG fuel system.  (Pls-SDF ¶¶ 33–34; Michaels Dep., 34:8–15, 41:15–18.)  While this fact does not directly contradict Pape's assertion that the subject truck represented the first installation of a *Momentum* CNG fuel system onto a commercial truck, it does lend support to Plaintiffs' argument that Pape was seeking to expand its business to include the sale of trucks installed with CNG systems and therefore calls into question Pape's argument that the installation of the subject fuel system was always meant to be a "one-time" event.

1    Regardless of the pre-existing B&N-Momentum relationship, Pape took action to install

2 the subject fuel system onto the subject truck which, in turn, it sold to B&N.  This action resulted

3 in the sale of a Momentum fuel system unit, with the potential for additional sales.  As previously

4 discussed, the evidence submitted by the opposing parties indicates Pape was considering

5 expanding its inventory to cater to customers in the CNG fuel system arena.  Such evidence

6 conflicts with Pape's assertion that the Momentum fuel system installation was a "one-time deal."

7 Again, as conflicting evidence must be viewed in the light most favorable to the nonmoving

8 parties, the Court cannot conclude Pape has established this factor weighs in its favor.

9        c.    **Whether Defendant had Control Over the Manufacturing or Distribution
              Process**
10

11   Pape argues it had no business or other relationship with Momentum outside of the events

12 underlying this litigation, and no relationship with Carleton; thus, it had no leverage to enhance

13 the safety of Momentum's fuel systems or with Cobham to promote their products.   More

14 specifically, Pape asserts that, until the events relevant to the instant litigation, Pape did not use

15 its facilities to install CNG fuel systems onto trucks for customers; rather, Paper Trucks would

16 order the truck for the customer from Kenworth, Kenworth would send the truck to a third-party

17 company for installation of the CNG fuel system, and once the system was installed on the truck,

18 it would be delivered to Pape for sale to the customer.  (ECF No. 106 at 8.)   Therefore, Pape

19 argues it had no control over, and no substantial ability to influence, Momentum's manufacturing

20 or distribution process.  (Id. at 10–11, 12–13.)

21   First, the Court notes this argument appears unavailing.  As previously discussed, the

22 focus of the strict liability analysis with respect to a retailer is the objective of the parties and the

23 circumstances of the at-issue transaction.  Hernandezcueva., 233 Cal. App. 4th at 258, 260.  Thus,

24 the focus of the instant strict liability analysis is not Pape's prior practices with respect to

25 installation and ordering of CNG trucks, but its actions with respect to the instant transaction,

26 here, the sale of a Kenworth commercial truck equipped with a Momentum CNG fuel system.

27 Further, many of the supporting facts for Pape's argument appear to be disputed.  As discussed,

28 the opposing parties argue and submit evidence that, regardless of Pape's past practices, the

1    installation of the Momentum fuel system onto the subject truck was completed in furtherance of

2    potentially expanding Pape's business to include additional CNG-equipped sales.  (PT-SUF ¶ 79;

3    Pls-SDF ¶ 11; Jimerson Dep., 88:2–8; Culberson Dep., 173:13–16.)  The opposing parties further

4    show the installation related to the subject vehicle took place on Pape's premises and involved

5    Pape's employees.  (See ECF No. 107-1 ¶¶ 74–76; see also Pls-SDF ¶¶ 2–5; Jerrad Dep., Ex. 6;

6    Culberson Dep., 79:22–24, 87:5–9, Exs. J, K; Jimerson Dep., 86:17–20, 87:4–6.)  The opposing

7    parties also submit evidence of the communications and collaboration between Pape's employees

8    and Momentum in completing the installation of the subject fuel system.  (See ECF No. 107-1 ¶

9    80; Jerrad Dep., 39:4–11, 36:18–21.)  This too, supports an inference that Pape was developing its

10   own relationship with Momentum in furtherance of its expansion plans.  On this record, and

11   viewing conflicting evidence in the light most favorable to the nonmoving parties, the Court

12   cannot conclude Pape has established this factor weighs in its favor within the context of

13   summary judgment.

14        Thus, even though it need not reach the Bay Summit factors because Pape was the retail

15   seller of the subject truck and therefore within the vertical line of distribution with respect to the

16   sale of the completed subject truck, the Court finds Pape has not met its burden to establish there

17   is no material dispute of fact that the Bay Summit factors weigh against a finding of strict liability

18   for Pape Trucks.  As such, summary judgment must be denied.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

2

## V.

### CONCLUSION AND ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendant Pape Trucks, Inc.'s motion for summary judgment and summary adjudication (ECF No. 106) is DENIED.

IT IS SO ORDERED.

Dated:   **August 11, 2023**

_____
UNITED STATES MAGISTRATE JUDGE

29