1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM LEE JOHNSON, et al., | Case No.  1:19-cv-00105-SAB |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS CARLETON AND COBHAM'S MOTION TO LIMIT OPINIONS AND TESTIMONY OF PAPE'S EXPERT ROBERT A. CARNAHAN; DENYING DEFENDANTS CARLETON AND COBHAM'S MOTION TO LIMIT OPINIONS OF MOMENTUM'S EXPERT AARON JONES, P.E.; AND DENYING DEFENDANTS CARLETON AND COBHAM'S MOTION TO EXCLUDE OR LIMIT OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT BRIAN SPENCER |
| v. | |
| NATURAL GAS FUEL SYSTEMS, INC. D.B.A. MOMENTUL FUEL TECHNOLOGY, et al., | |
| Defendants. | |
| | (ECF Nos. 131, 132, 133, 135, 136, 137, 139, 141, 142, 166, 167, 168) |
| MARKEL AMERICAN INSURANCE COMPANY as Subrogee of AMERICAN NATURAL GAS, LLC, | |
| Plaintiff, | |
| v. | |
| NATURAL GAS FUEL SYSTEMS, INC. D.B.A. MOMENTUL FUEL TECHNOLOGY, et al., | |
| Defendants. | |

1    Currently before the Court are three motions filed by Defendants Carleton Technologies,

2    Inc. and Cobham PLC ("Defendants") to limit or exclude expert testimony during the trial of this

3    matter.[1]  (ECF Nos. 131, 132, 133.)   The Court, having reviewed the record, finds this matter

4    suitable for decision without oral argument.   See Local Rule 230(g).

5                                                **I.**

6                                    **FACTUAL BACKGROUND**

7    This is a California state law negligence and product liability action arising out of the

8    personal injuries sustained by Plaintiff William Johnson ("William") on December 21, 2018, as a

9    result of an explosion that occurred during the refueling of a compressed natural gas ("CNG")

10   cylinder that was part of the fueling system for a commercial vehicle.  William, by and through

11   his guardian ad litem Jerrad Johnson ("Jerrad") (see ECF No. 12), as well as Plaintiffs Joan

12   Johnson and B&N Trucking, Inc. ("B&N") (collectively "Plaintiffs") initiated this action on

13   January 24, 2019.  (ECF 1.)

14   Plaintiffs filed the operative first amended complaint ("FAC") on February 14, 2019.

15   (ECF No 13.)  The operative first amended complaint proceeds against Carleton, Pape Trucks

16   ("Pape"), and Natural Gas Fuel Systems, Inc. dba Momentum Fuel Technology ("Momentum").

17   (Id.)    Carleton asserts crossclaims against Momentum and Pape for (1) indemnity and

18   contribution; and (2) declaratory relief.  (ECF No. 22 at 18–20.)  Momentum asserts a crossclaim

19   against Carleton for: (1) express indemnity; (2) breach of contract; (3) total equitable indemnity;

20   (4) contribution; and (5) declaratory relief.  (ECF No. 28 at 25-29.) Pape asserts crossclaims

21   against Momentum and Carleton for (1) total equitable indemnity; (2) contribution; (3)

22   negligence (regarding the design, construction, installation and distribution of the CNG system

23   sold to Pape and installed in the vehicles sold to B&N); and (4) declaratory relief.  (ECF No. 36 at

24   16–18.)  On November 12, 2019, Markel filed a motion to intervene as subrogee of American

25   Natural Gas, LLC (the owner of the gas station at which the incident occurred).  (ECF No. 53.)

26   Markle asserts the causes of action on behalf of the Insured against Momentum, Carleton, and

27   ───────────────────────────

[1] The parties have consented to the jurisdiction of the magistrate judge and this matter has been assigned to the

28   undersigned for all purposes.  (ECF Nos. 153, 154, 155, 156, 157, 159.)

Pape Trucks for (1) negligence; (2) strict productions liability–manufacturing defect; (3) strict products liability–design defect; and (4) strict products liability–failure to warn. (Id. at ¶¶ 23–51.)

On April 4, 2024, Defendants filed motions to limit the opinions and testimony of Momentum, Pape, and Plaintiffs' experts. (Defs. Carleton and Cobham PLC's Mot. to Limit Opinions and Testimony of Pape's Expert Robert A. Carnahan ("Carnahan Mot."),[2] ECF No. 131; Defs. Carleton and Cobham PLC's Mot. to Limit Opinions of Aaron Jones, P.E. ("Jones Mot."), ECF No. 132; Defs. Carleton and Cobham PLC's Mot. to Exclude or Limit Opinions and Testimony of Expert Brian Spencer ("Spencer Mot."), ECF No. 133.)   On April 15, 2024, Momentum, Pape, and Plaintiffs filed oppositions to the motions, Plaintiffs filed a joinder in Momentum's and Pape's opposition, and Markel filed a notice of joinder in Plaintiffs' opposition to Defendants' motions to exclude or limit the testimony of Brian Spencer. (Opp. to Defs.' Mot. to Limit Expert Opinions of Expert Aaron Jones ("Jones Opp."), ECF No. 135; Def. Pape's Opp. to Defs.' Mot. to Limit Opinions and Testimony of Pape's Expert Robert A. Carnahan ("Carnahan Opp."), ECF No. 136; Pls.' Opp. to Defs. Carleton and Cobham's Mot. to Exclude or Limit Opinions and Testimony of Pls.' Expert Brian Spencer ("Spencer Opp."), ECF No. 137; Pls.' Joinder in Def. Momentum Fuel Technologies, Inc. Opp. to Def. Carleton Technologies Inc. and Cobham PLC's Motion to Limit Opinions of Momentum's Expert Aaron Jones, P.E., ECF No. 139; Pls.' Joinder in Def. Pape Trucks Inc. Opp. to Def. Carleton Technologies, Inc. and Cobham PLC's Mot. to Limit Opinions of Pape's Expert Robert A. Carnahan, ECF No. 140; Pl. Intervenor Markel American Insurance Co.'s Not. of Joinder in Pl. Johnson's Opp. to Defs. Carleton Technologies, Inc. and Cobham PLC's Mot. to Exclude or Limit Opinions and Testimony of Pl. Johnson's Expert Brian Spencer, ECF No. 141.)   On July 19, 2024, Defendants filed replies to the oppositions of Momentum, Pape, and Plaintiffs. (Defs. Carleton Technologies, Inc. and Cobham PLC's Reply in Support of Mot. to Limit Opinions of Momentum's Expert Aaron Jones, P.E., ECF No. 166; Defs. Carleton Technologies, Inc. and Cobham PLC's Reply in Support of Mot. to Limit Opinions and Testimony of Pape's Expert Robert A. Carnahan, ECF

---

[2] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

No. 167; Defs. Carleton Technologies, Inc. and Cobham PLC's Reply in Support of Mot. to Exclude or Limit Opinions of Pls.' Expert Brian Spencer, ECF No. 168.)

The parties do not dispute the following facts:

> Plaintiffs purchased two trucks from defendant Pape, which were to be equipped with a CNG engine, manufactured and designed by defendant Momentum Fuel Technologies ("Momentum"), equipped with CNG cylinders manufactured and designed by Cobham. The subject vehicle exploded due to a rupture of one of the CNG cylinders ("subject cylinder"). The subject cylinder is a type IV composite overwrapped pressure vessel ("COPV"). As part of Cobham's testing requirements, the subject cylinder was pressurized to over 5400 PSI for 6 minutes and did not rupture. The subject cylinder's operating pressure is 3600 PSI. During [William's] initial fill of the subject truck, the subject cylinder was pressurized at or below 3600 PSI when the subject cylinder ruptured, resulting in a pressurized, nonthermal explosion. The [ ] subject cylinder was never pressurized to operating pressure after it left Cobham's possession and [William] should not have been the first person to fully pressurize the subject cylinder after it left Cobham's possession.

(Carnahan Mot. at 7;[3] Jones Mot. at 6, ECF No. 132; Spencer Mot. at 7.) The parties dispute what caused the rupture of the cylinder.

## II.

## Legal Standard

Expert witnesses in federal litigation are governed by Rules 702 to 705 of the Federal Rules of Evidence. Rule 702 provides that expert testimony is admissible if 1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; 2) the scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; 3) the testimony is based on sufficient facts or data; 4) the testimony is the product of reliable principles and methods; and 5) the witness has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593-94 (1993), the Supreme Court provided a non-exclusive, nondispositive list of factors to use in assessing the reliability of an expert's testimony: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4)

---

[3] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

whether it has been generally accepted by the scientific community.  In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999), the Supreme Court held that these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."

The trial judge has a gate keeping role to "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  Kumho Tire Co., Ltd., 526 U.S. at 147 (quoting Daubert, 509 U.S. at 589.  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."  City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010)).

The court's "gatekeeping function is not limited to 'scientific' expert testimony, but applies to all expert testimony[.]"  United States v. Hankey, 203 F.3d 1160, 1167 (9th Cir. 2000).  When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify, and the jury decides how much weight to give that testimony.  Primiano, 598 F.3d at 564–65 (citing United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir.2006)).  The inquiry into whether an expert opinion is admissible is a "flexible one" where shaky "but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  Primiano, 598 F.3d at 564 (citing Daubert, 509 U.S. at 592-96).  The Supreme Court has held that "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case."  Kumho Tire Co., Ltd., 526 U.S. at 158.  "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," however, "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage."  Elosu v. Middlefork Ranch Inc., 26 F.4th 1017, 1026 (9th Cir. 2022) (citation omitted).

///

**III.**

**DISCUSSION AND ANALYSIS**

Defendants bring motions to exclude or limit the testimony of Robert A. Carnahan, Defendant Pape's expert witness; Aaron Jones, P.E., Defendant Momentum's expert witness; and Brian Spencer, Ph.D., Plaintiffs' expert witness.  The Court shall first address issues common to all motions and then address the remainder of each motion separately.

**A.     Issues Common to All Motions**

Upon review of the motions, there are several issues that are common to all.

**1.     Whether expert testimony should be allowed at trial**

Plaintiffs contend that the agreed upon facts are controlling in this matter and since this is an admitted liability case no expert testimony is required.  (Spencer Opp. at 6.)  Plaintiffs cite to Imprimis Int'l v. Fraidenburgh, 2007 U.S. Dist. LEXIS 39408 (E.D. Cal 2007) (citing United States v. First Nat'l Bank, 652 F.2d 882, 886 (9th Cir. 1981) in support of their argument.  The citation in Imprimis, Int'l states,

> As such, the undisputed facts, as set forth by the parties in their joint final pretrial report (Docket # 65) and incorporated in the court's Final Pretrial Conference Order (Docket # 69), are binding and controlling.  See United States v. First Nat'l Bank of Circle, 652 F.2d 882, 886 (9th Cir.1981) ('[A] party need offer no proof at trial as to matters agreed to in the order, nor may a party offer evidence or advance theorems at the trial which are not included in the order or which contradict its terms.').

2007 U.S. Dist. LEXIS 39408, *3 n.4.  Both of these cases address the effect of the pretrial order and do not stand for the proposition that expert testimony is not needed in a situation such as here, where there are crossclaims brought for contribution and indemnification.  While the parties do not dispute liability, the trier of fact will be tasked with deciding the amount of damages and indemnification and contribution at issue between the defendants.  See Res-Care Inc. v. Roto-Rooter Servs. Co., 753 F.Supp.2d 970, 981 (N.D. Cal. 2010).  While it is true that an expert is not required to find that the subject vehicle exploded causing William's injuries, the cause of the vehicle exploding is relevant to the contribution and indemnification crossclaims.

Under California law, "[a] product liability case must be based on substantial evidence establishing both the defect and causation (a substantial probability that the design defect, and not

6

something else, caused the plaintiff's injury) and where . . . the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation." Stephen v. Ford Motor Co., 134 Cal.App.4th 1363, 1373 (2005); see also Pierson v. Ford Motor Co., 445 F.App'x 966, 969 (9th Cir. 2011) (dissenting opinion); Monroe v. Zimmer U.S. Inc., 766 F.Supp.2d 1012, 1028 (E.D. Cal. 2011). In this case, the trier of fact will be required to consider the cause of the explosion to determine the issue of contribution and indemnification between the defendants and this is a complex issue that is beyond common experience so expert opinion will be necessary to assist the trier of fact. See Shalaby v. Newell Rubbermaid, Inc., 379 F.App'x 620, 622 (9th Cir. 2010) (Determining the cause of explosion required exploration and evaluation of complex facts and theory "beyond common experience" and "presented questions of physics, metallurgy, and engineering related to the construction, composition, design and operation of a handheld torch attached to a gas cylinder."). The Court finds that expert testimony is necessary on the issue of the causation of the rupture of the cylinder.

2. Opinion regarding a gas leak in the cylinder causing the rupture

Momentum's engineering expert Aaron Jones and Plaintiffs' expert Brian Spencer both concluded that the subject cylinder ruptured due to a gas leak in the cylinder. (Jones Mot. at 11; Momentum Mot. at 11.) Defendant Pape's expert Robert Carnahan stated that rupture of the tank due to a boss leaking during fueling cannot be ruled out. (Carnahan Mot. at 11.)

a. **Defendants' argument**

Defendants seek to preclude all experts from testifying that a cracked and leaking boss allowed gas to leak causing the rupture of the cylinder. Defendants contend that this theory has never occurred with Type 4 cylinders, has never been tested, and is not based on any authoritative literature. Further, this theory has been debunked by Cobham's expert and is inconsistent with the National Aeronautics and Space Administration's ("NASA") own assessment as to the causes of COPV ruptures. (Carnahan Mot. at 13; Jones Mot. at 12-13; Spencer Mot. at 15.)

b. **Momentum's argument in opposition**

Momentum counters that Defendants rely on the testimony of their expert who claims to have tested Jones' theory and conclusively demonstrated that gas cannot flow laterally through

the carbon filter, but the Court's role under <u>Daubert</u> is not to weigh the testimony or to supplant the jury's fact-finding role.  The Court's role is limited to ensuring the evidence in dispute is sufficiently reliable and relevant to the issue before the jury that is appropriate for the jury's consideration.  (Jones Opp. at 20.)

Momentum is arguing that Cobham is seeking for this Court to believe the testimony of its own expert and disregard Mr. Jones' testimony which is improper under <u>Daubert</u>.  Further, Cobham seeks to have this Court weigh the evidence by pointing to evidence from NASA that a leaking tank is not a known cause of COPV ruptures, but weighing the evidence is improper under <u>Daubert</u>.  Cobham's argument that a leak causing a rupture in a Type 4 tank has never occurred before is an unsupported representation, and an assertion that a given product has never failed before is not a valid defense to a product liability claim.  (<u>Id.</u> at 21.)  Cobham does not explain how the absence of prior similar incidents is even relevant to the <u>Daubert</u> analysis.  (<u>Id.</u> at 22.)

### c.      Plaintiffs' argument in opposition

Plaintiffs respond that while Cobham notes that Mr. Spencer has been unable to point to another incidence of a Type 4 cylinder rupturing due to a leak, it is of no consequence because the absence of prior incidents is not probative as to whether a particular manufactured item contains a manufacturing defect.  (Spencer Opp. at 137.)  Experts are often called on to evaluate novel issues and Cobham retained its own expert to opine as to causation in this matter.  Plaintiffs assert that the fact that Mr. Grewal tested Mr. Spencer's theory actually supports Mr. Spencer's theory regardless of the result of his testing.  Further, Cobham's assertion that the theory is refuted by NASA, setting aside that this is an issue of weight and not admissibility of the evidence, is untrue.  NASA failure modes list COPV failures to specifically include "Crack Growth in Boss."  (<u>Id.</u> at 15.)

### d.      Defendants' argument in reply

Defendants reply there is no evidence that the theory regarding a leak in the tank causing a rupture has been generally accepted in the scientific community, and there is no literature or documents that support the theory.  (Carnahan Reply at 4-5; Jones Reply at 7.)

1

### e.      Analysis

2       While Defendants argue that the theory that a gas leak would have caused the explosion

3   has been disproved by their expert and is inconsistent with NASA standards[4] as to the causes of

4   COPV ruptures, this goes to the weight, not the admissibility of the testimony.  "The test under

5   Daubert is not the correctness of the expert's conclusions but the soundness of [the expert's]

6   methodology.   Under Daubert, the district judge is a gatekeeper, not a fact finder.  When an

7   expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify

8   and the jury decides how much weight to give that testimony."  Primiano, 598 F.3d at 564-65

9   (internal punctuation and citations omitted).

10      "Where two credible experts disagree, it is the job of the fact finder, not the trial court, to

11  determine which source is more credible and reliable."  City of Pomona, 750 F.3d at 1049

12  (quoting Sandoval–Mendoza, 472 F.3d at 654).  Simply put, "[t]he district court is not tasked

13  with deciding whether the expert is right or wrong, just whether his testimony has substance such

14  that it would be helpful to a jury."  City of Pomona, 750 F.3d at 1044 (quoting Alaska Rent–A–

15  Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969-70 (9th Cir. 2013)).  A disagreement

16  between the experts is not a reason to limit the challenged testimony.

17      Further, while Defendants argue that the experts have not tested their theory, point to no

18  prior cases where a rupture was caused by a leaking cylinder, or any manufacturer that warns that

19  a leaking cylinder could cause an explosion, "[e]xperts working in specialized, scientific, and

20  uncertain fields regularly 'extrapolate from existing data' and generate novel hypotheses about

21  complex issues."  Elosu, 26 F.4th at 1026 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146

22  (1997)).  This is why experts are permitted wide latitude to offer opinions, even when not based

23  on firsthand knowledge or observation.  Elosu, 26 F.4th at 1026.

24      Defendants also seek to exclude any testimony that a leak in the cylinder could have

25  caused the rupture arguing that this theory is based on other expert's opinions, has not been

26  subject to peer review and publication, and the experts' opinions were developed for litigation.

27

28  [4] The Court does note that the Failure Modes identified by NASA include "crack growth in boss" which can result in catastrophic failure.  (Composite Overwrapped Pressure Vessels, a Primer, 91, ECF No. 131-1.)

However, although independent research into a topic is helpful, it is not necessary to establish reliability where the expert presents other objective, verifiable evidence that the testimony is based on scientifically valid principles.  Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1235 (9th Cir. 2017).  Further, expert testimony can be reliable without peer review and publication especially where the subject is rare making published studies difficult.  Wendell, 858 F.3d at 1235.

The Court finds that Defendants arguments challenging the testimony regarding a gas leak causing the rupture of the cylinder goes to the weight of the experts' testimony and not the admissibility.

3.   Testimony regarding whether testing of the cylinder failed to comply with ANSI NGV 2

a.   Defendants' argument

Defendants seek to preclude any testimony that testing of the cylinder failed to comply with the American National Standard for Compressed Natural Gas Fuel Containers ("ANSI NGV 2").  They contend that Mr. Carnahan's opinion as to the requirements of ANSI NGV 2 is unreliable, not based on sufficient facts or data or reliable principles and methods, is irrelevant, and based solely on his reading of ANSI NGV 2 (Carnahan Mot. at 2); Mr. Jones did not participate in developing the standards, has not spoken to anyone involved in drafting the standards regarding their interpretation of the standard, and has not leak tested Type 4 tanks (Jones Mot. 10-11); and Mr. Spencer has no basis for his opinion, was not involved in developing NGV 2 nor contributed to its development and has not spoken to anyone who developed NGV 2 in terms of how to interpret the testing requirement (Spencer Mot. at 18).

Defendants also argue that the experts attempt to provide opinions as to Cobham's purported failure to comply with ANSI NGV 2 based entirely on their reading of the statute and nothing more.   (Carnahan Mot. at 14-15; Jones Mot. at 11; Spencer Mot at 18.)  Further, opinion testimony regarding their compliance with leak testing is irrelevant to the issue at hand--what caused the subject cylinder to rupture.  It is undisputed that Cobham hydrostatically tested the subject cylinders to over 5400 PSI for 6 minutes without rupturing and the experts have failed to

10

assert, allege or testify as to how Cobham's decision to utilize water in lieu of gas caused the incident.  (Carnahan Mot. at 14; Jones Mot. at 11; Spencer Motion at 18-19.)

### a.  Pape's argument in opposition

Pape responds that Cobham is seeking to exclude what it thinks is an incorrect interpretation of NGV 2 which is an improper subject for a <u>Daubert</u> motion.  (Carnahan Opp. at 16.)  Mr. Carnahan's interpretation is based on a plain reading of the statute and supported by the testimony of a Cobham employee who stated that Cobham's leak test using water resulted in a confusing situation where 4126-80 tanks would pass Cobham's leak test even though they were leaking water when leak tested.  (<u>Id.</u> at 16-17.)

### b.  Momentum's argument in opposition

Momentum responds that Defendants have only set forth a portion of the relevant standard and their assertion that water testing is an "acceptable alternative method" is wrong.  This issue does not turn on expert testimony as much as an interpretation of the sections which is a question of law.  Regardless, any disagreement that Defendants have with the interpretation of the section goes only to weight not admissibility.  (Jones Opp. at 20.)

Momentum argues that the flaw in Defendants' argument is that the issue is not the procedures that Cobham used but the fact that Cobham ignored the results of its investigation and testing which yielded information about the defects in its products.  By ignoring the results of its investigation, Cobham allowed a defective product to be delivered leading to the accident.  (<u>Id.</u> at 23.)

### d.    Defendants' argument in reply

Defendants reply sets forth the same arguments that the experts do not have the qualifications to opine on the standards under the NGV 2 and their compliance with NGV 2 is irrelevant.  (Jones Reply at 4-5; Carnahan Reply at 6-7; Spencer Reply at 10.)

Defendants argue that <u>Gaddy v. Am. Interstate Ins. Co.</u>, No. 1:14-CV-1928-WSD, 2017 WL 11629052 (N.D. Ga. Nov. 3, 2017) supports excluding testimony regarding the standards because the expert's interpretation of the standards were not subjected to peer review, not published, nor did the expert serve on any subcommittee.  (Jones Reply at 5; Carnahan Reply at 7;

1   Spencer Reply at 10.)

2       **e.      Analysis**

3       Expert witnesses are allowed to testify about industry standards.[5]  Hangarter v. Provident

4   Life & Accident Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004).  Further, the Daubert factors are

5   not applicable to nonscientific testimony, like testimony about industry standards, in which

6   reliability depends heavily on the knowledge and experience of the expert rather than the

7   methodology or theory behind the testimony.  Hangarter, 373 F.3d 998 at 1017; Spearman Corp.

8   Marysville Div. v. Boeing Co., No. C20-13RSM, 2022 WL 6751797, at *4 (W.D. Wash. Oct. 11,

9   2022); King v. GEICO Indem. Co., 712 Fed. Appx. 649, 651 (9th Cir. 2017) ("Although it is well

10  established that experts may not give opinions as to legal conclusions, experts may testify about

11  industry standards").  Whether the experts have the requisite knowledge to testify as to the

12  industry standard will be addressed below in discussing their qualifications.

13      While Defendants argue that Gaddy supports exclusion of the testimony, the Court finds

14  Gaddy to be distinguishable.  In Gaddy, the expert was not testifying as to the specific standard

15  but was borrowing a different standard to attack the specificity of the standard that applied in the

16  case.  The court found there was no basis to show that the borrowing approach was an industry

17  standard.  2017 WL 11629052, at *3.  There is no issue here that the experts are borrowing a

18  different standard than would apply in this action.

19      Assessing a proffer of expert testimony "entails a preliminary assessment of whether the

20  reasoning or methodology underlying the testimony is scientifically valid and of whether that

21  reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at

22  592–93.  While Rule 702 is applied with a "liberal thrust" that favors admission, it does require

23  expert testimony to be relevant and reliable.  Messick v. Novartis Pharms. Corp., 747 F.3d 1193,

24

25  [5] In their reply, Defendants argue that the testimony regarding ANSI NGV2 does not relate to industry standards but
    is a legal interpretation of the regulations.  However, the ANSI is the nationally recognized coordinator of voluntary
26  standards development in the United States and have some 10,000 national consensus standards currently approved
    as American National Standards.  (American National Standard for Compressed Natural Gas Vehicle Fuel
27  Containers, 110, ECF No. 131-1.)  The evidence suggests that the ANSI NGV2 standards do relate to industry
    standards and as such the Court finds that the testimony would be admissible as long as the expert possesses
28  sufficient background with the standards for the testimony to be reliable.

1196 (9th Cir. 2014).  "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702."  Elsayed Mukhtar v. California State University, Hayward, 299 F.3d 1053, 1063 n.7 (9th Cir.2002).

"Relevancy simply requires that '[t]he evidence . . . logically advance a material aspect of the party's case.' "  Est. of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir. 2014), overruled on other grounds by United States v. Bacon, 979 F.3d 766 (9th Cir. 2020) (quoting Cooper v. Brown, 510 F.3d 870, 942 (9th Cir.2007).  "Relevancy depends on the particular law at issue because '[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.' "  Messick, 747 F.3d at 1196–97 (quoting Primiano, 598 F.3d at 565).  "California state products liability law requires only that a plaintiff show that the defendant's conduct was 'more likely than not' a substantial factor in causing the injury in order to prove specific causation."  Messick, 747 F.3d at 1197 (citing Saelzler v. Advanced Grp. 400, 25 Cal.4th 763, 107 Cal.Rptr.2d 617, 23 P.3d 1143, 1152 (2001)).

While Defendants argue that the cylinder was tested without rupturing, evidence has been presented that as early as October 5, 2018, Cobham was aware that their current design did not provide sufficient margin to ensure an acceptable risk going forward.

> - Prone to cracking in the outboard corner of the 0-ring groove
> - Crack grows into fastener counterbore at closest point
> - Crack grows up into boss everywhere else
> - Cracking causes nibbling of 0-ring
> - Nibbling leads to leaking of cylinder

(4114 Boss Redesign Delta CDR Momentum Type IV Tanks, Dated October 5, 2018, at 4, ECF No. 137-2.)  Mr. Carnahan testified that the end of the cylinder that failed appears to have been cracked prior to the rupture of the tank.  (Carnahan Decl. at ¶ 5, ECF No. 136-1.)  "Cobham's analysis showed that subject tank boss design can be highly stressed even at low tank pressure. Cobham took measures to mitigate boss leaks that occurred during batch cycle testing, but they continued to use the same boss design."  (Id.)  Further, "Cobham documentation shows that some tanks that met their hydrostatic test pass criterion had leaks, meaning that hydrostatic testing alone is insufficient for detecting some leaks."  (Id.)

"The relevancy bar is low, demanding only that the evidence 'logically advances a

material aspect of the proposing party's case.' " Messick, 747 F.3d at 1196 (quoting Daubert v. Merrell Dow Pharm., Inc. ("Daubert II"), 43 F.3d 1311, 1315 (9th Cir.1995)). The Court finds that the testimony regarding the testing of the cylinders is relevant because it sufficiently relates to the facts of this case and may be useful to the trier of fact in resolving the factual dispute regarding the cause of the rupture of the cylinder. Daubert, 509 U.S. at 591.

The Court next considers the individual motions to exclude or limit the testimony of the experts.

### B.   Motion to Limit Opinions and Testimony of Robert A. Carnahan

#### 1.   Defendants' Argument

Defendants assert that Mr. Carnahan stated that he had not determined with certainty what caused the tank to rupture and attempts to suggest that the subject cylinder may have a crack and the leaking boss allowed for gas to infiltrate the carbon fiber composite and weaken it to the extent that the tank could rupture at service pressure. (Carnahan Mot. at 10-11.) However, Mr. Carnahan also stated that although he is not aware of any prior tank ruptures having occurred in this manner, rupture of the tank due to a boss leaking during fueling cannot be ruled out. Defendants contend Mr. Carnahan is attempting to latch onto the theory advanced by other experts, even though he is not able to determine the cause of the accident. (Id. at 11.)

#### 2.   Pape's Argument in Opposition

Pate counters that Mr. Carnahan's opinion that a crack in the subject tank could have led to its rupture is not *ipse dixit*[6] as claimed by Defendants. Rather Cobham knew that the crack was occurring during their production process for this exact type of tank and Mr. Carnahan's opinion is supported by his analysis of Cobham's CNG tank production process documents produced in the litigation and other key admissions made by Cobham's employees. (Carnahan Opp. at 4.)

#### 3.   Analysis

Defendants suggest that Mr. Carnahan's opinion should be excluded because he was

---

[6] An *ipse dixit* is "an assertion made but not proved." Sumotext Corp. v. Zoove, Inc., No. 16-CV-01370-BLF, 2020 WL 264701, at *6 n.2 (N.D. Cal. Jan. 17, 2020) (citing Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/ipse% 20dixit (last visited December 30, 2019)).

unable to conclusively determine what caused the rupture of the cylinder, but "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork." Monroe, 766 F.Supp.2d at 1032 (quoting Primiano, 598 F.3d at 565.)   "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." Id. (quoting Sandoval–Mendoza, 472 F.3d at 655).

Defendants also argue that Mr. Carnahan is attempting to join the theory advanced by Plaintiffs and Momentum's experts without a reasonable degree of certainty and his opinion is unreliable because it is plain *ipse dixit* and the absence of any scientific underpinnings render it unreliable.  The reliability threshold requires that the expert's testimony have 'a reliable basis in the knowledge and experience of the relevant discipline.' " Messick, 747 F.3d at 1197 (quoting Kumho Tire Co., Ltd., 526 U.S. at 149).  The court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid." Daubert, 509 U.S. at 592–93.  A district court errs by looking too narrowly at individual factors without taking into account the broader picture of the experts' overall methodology.  Wendell, 858 F.3d at 1233.

Defendants further contend that Mr. Carnahan has not explained how his experience leads to the conclusions reached, why his experience is a sufficient basis for his opinion, and how his experience is reliably applied to the facts of this case.[7]  (Carnahan Reply at 3 (citing Fed. R. Evid. 702 Advisory Committee's notes (2000)).  Pape has presented evidence that Mr. Carnahan has extensive experience in failure analysis and prevention, including carbon fiber composites similar to the tank at issue in this action.  Mr. Carnahan is a principal engineer with Exponent, Inc. and holds an M.S. degree in Metallurgical Engineering and a B.S. degree in Materials and

---

[7] The Court finds that the cases Defendants rely on in argument are distinguishable.  See Powell v. Anheuser-Busch Inc., No. CV 09-729-JFW (VBKX), 2012 WL 12953439, at *7 (C.D. Cal. Sept. 24, 2012) (expert relied on incomplete facts and data making his testimony unreliable); Messer v. State Farm Fire and Cas. Co., No. CIV03-1653PHXJWS, 2005 WL 5976565, at *4 (D. Ariz. Aug. 29, 2005) (excluding testimony of attorney who failed to explain how experience in insurance litigation is a sufficient basis for opinion that defendant "did not investigate, handle, and assess plaintiff's insurance claim correctly, or that defendant engaged in unfair and/or deceptive practices"); Watts v. Allstate Indem. Co., No. CIV. S-08-1877 LKK, 2013 WL 210059, at *11 (E.D. Cal. Jan. 17, 2013) (expert failed to explain how she derived her conclusions regarding collisions which led to unsafe seatbelt stretching from the fields in the insurer's computer systems); Hernandez v. City of Albuquerque, No. CIV 02-0333 JB/RHS, 2004 WL 5522847, at *7 (D.N.M. Jan. 23, 2004) (excluding portions of expert testimony that were primarily based on possibilities instead of probabilities).

Metallurgical Engineering from the University of Michigan.  He is a licensed professional engineer in Arizona, California, Michigan, Nevada, and Texas.  He was employed in the Nuclear Energy Division of General Electric Company in San Jose, California, and was admitted to the Materials and Science and Engineering Department at Stanford University and took the core courses required for a Ph.D.  He is certified by the American Petroleum Institute as a corrosion and materials professional.  (Carnahan Decl. at ¶ 1.)  Mr. Carnahan has expertise in failure analysis and prevention, physical metallurgy, materials selection, fracture mechanics, corrosion, welding, engineering mechanics, and machine design.  He has previously investigated failures of carbon fiber composite and fiberglass CNG fuel tanks similar to the subject tank.  (Id. at ¶ 4.)  Defendants have not challenged Mr. Carnahan's qualifications as an expert in this matter, and the Court finds that Pape has presented evidence that Mr. Carnahan is qualified to opine on the condition of the cylinder and the potential cause of the rupture.

Pape counters that Mr. Carnahan can properly address the industry standards and Cobham's testing procedures.  (Carnahan Opp. at 17.)  As relevant here, Mr. Carnahan opined,

> Cobham did not perform NGV 2 Section 9.3 gas leak testing required by NGV 2.  Cobham decided, with no documented technical basis, that Section 9.2 hydrostatic testing met the requirements of the Section 9.3 gas leak test.  Cobham documentation shows that some tanks that met their hydrostatic test pass criterion had leaks, meaning that hydrostatic testing alone is insufficient for detecting some leaks.

(Carnahan Decl. at ¶ 5.)  Mr. Carnahan testified as to the testing requirements of ANSI NGV 2 section 9.3 which applies to Type 4 containers.  (Id. at ¶ 13.)  Mr. Carnahan determined that Cobham did not perform NGV2 section 9.3 leak test on the subject container because it determined that a water test was an acceptable alternative method, and that Cobham should have contacted ANSI for clarification as to whether they could substitute a water test for the section 9.3 gas leak test.  (Id.)  Mr. Carnahan determined from reviewing leak testing documentation from Cobham, that the standard Cobham adopted was not an adequate method for detecting leaking tanks because an employee testified that it was possible for a container to pass the leak test even if water was leaking.  (Id. at ¶ 15.)  Mr. Carnahan agrees with Momentum's expert that a gas test is required under section 9.3.  (Id.)  Mr. Carnahan testified that the decision not to use a gas test

could be the cause of the rupture of the subject tank because if the gas test had been used and the tank was found to be leaking, Cobham would likely have never shipped the subject tank.  (Id. at ¶ 16.)  Mr. Carnahan explained that gas can leak through smaller spaces than water and that could be the difference as well as the pressurization with gas instead of water.  (Id.)  The Court finds that Pape has submitted sufficient evidence to demonstrate that Mr. Carnahan has sufficient knowledge to testify to the requirements of ANSI NGV2.

Mr. Carnahan's expert report also addresses the evidence he considered in arriving at his conclusions.  The report contains a section with an extensive review of Cobham's tank design, tank qualification and manufacturing process and devotes an entire subsection to boss cracking which occurred during Cobham's testing of the part number 4126-80 tanks (i.e., the same part number of the subject tank).  (Id. at ¶ 6, see Ex. A. at 72-100, ECF No. 136-1.)  Mr. Carnahan based this section of his report on his analysis of documents Cobham produced in this litigation, along with inspections of the subject tank and exemplar tanks.  (Carnahan Decl. at ¶ 6.)

Further, the report addresses the basis of his conclusion.  Upon testing of the boss from the incident tank, it was found that "[t]he [valve side] boss [from the subject tank] is quite thin at the bolt hole fracture locations," and [t]he fracture appearance is nearly identical to that of the bosses that were found cracked during [Cobham's] lot acceptance testing."  (Carnahan Decl. at ¶ 7, Exh. A at 61.)  Mr. Carnahan's work included optical microscope examination of exemplar 4126-80 tanks from Cobham as well as the subject tank which revealed considerable porosity in the composite.  (Carnahan Decl. at ¶ 11, Ex. A at 46, 48.)  Mr. Carnahan also testified that under certain circumstances, such as where there is sufficient porosity or delamination for the gas to get through, gas can flow laterally through the carbon filter.  (Depo. of Robert Carnahan ((Carnahan Depo.") 118:22-119:4, ECF No. 136-1 at 167-183.)  Three tanks were tested, the subject tank and two exemplar tanks, and there was considerable porosity present in each of the samples.  (Id., 133:4-17.)

While the court may screen an expert opinion for reliability and reject testimony that is wholly speculative, the court may not weigh the expert's conclusions or assume a factfinding role.  Elosu, 26 F.4th at 1020.  Here, Defendants seek to have the Court weigh the experts'

conclusions and exclude them, but this is not the role of the Court.  Rather, the gatekeeping

function is "to prevent unfounded or unreliable opinions from contaminating a jury trial."  Id.

"[W]hile a court may reject wholly speculative or unfounded testimony, it abuses its

discretion if it overlooks relevant data submitted as the foundation of an expert's remarks.  Elosu,

26 F.4th at 1025.  Contrary to Defendants' contention, Mr. Carnahan's opinion is not solely his

ipse dixit, but was based on his review of Defendant Cobham's tank qualification and production

process and the cracking of the bosses that occurred during Cobham's testing of the tanks, as well

as his inspection of the subject tank and exemplar tanks.  While Mr. Carnahan was not aware of

any manufacturer who provides information and a warning related to how a leak could lead to a

rupture nor could he identify any testing or evidence to support his contention that gas is capable

of flowing laterally through the carbon fiber composite of a Type 4 COPV or that a leak could

lead to a rupture, the Court finds this goes to the weight of Mr. Carnahan's testimony rather than

admissibility.  See City of Pomona, 750 F.3d at 1044 (quoting Alaska Rent–A–Car, 738 F.3d at

969 ("The Court is not to "exclude opinions merely because they are impeachable.").

Defendants also argue that Mr. Carnahan is attempting to join the opinions of Plaintiffs

and Momentum's expert that a leak caused the rupture.  During his deposition, Mr. Carnahan

testified as follows:

> Q. Now, you also understand that Mr. Jones and Mr. Spencer are of the opinion
> that the cause of the rupture was the leak in the tank?
> A. Yes.
> Q. Do you share that opinion?
> A. My opinion in that regard is that you can't rule it out.
> Q. Okay.
> A. I can't say whether or not that's what caused the tank to fail, but based on my
> understanding you can't rule it out.
> Q. Okay.  So it would be fair say that you do not share the opinion that the cause
> was a crack --a leak, but you are of the opinion that it can't be ruled out?
> A. Yes, simply stated, right, exactly.  So, you know, there is a crack in the boss, to
> what extent did gas leak through that crack and contribute to the tank failure, you
> know, I can't rule out that, you know, gas escaping through that crack didn't
> contribute to failure of the tank.

Carnahan Depo. at 62:7-63:1.)

Mr. Carnahan was unable to determine the cause of the rupture of the cylinder and the

Court finds that his testimony that a leak in the tank cannot be ruled out as a cause of the rupture

1  is not helpful to the jury.   Therefore, this testimony shall be excluded unless Defendants

2  questioning of Mr. Carnahan raises the issue during trial.   Should counsel believe that Defendants

3  questioning of Mr. Carnahan has rendered his testimony on this subject admissible, the issue shall

4  be raised outside the presence of the jury prior to eliciting the testimony.

5       The Court denies Defendants' motion to exclude the testimony of Mr. Carnahan on the

6  interpretation of ANSI NGV 2 and grants Defendants' motion to exclude Mr. Carnahan's

7  testimony that a leak in the tank caused the rupture cannot be ruled out.

8       **C.       Motion to Limit the Opinion of Momentum's Expert Aaron Jones, P.E.**

9            1.   Defendants' argument

10       Defendants argue that Mr. Jones is an engineer with a metallurgy background and is not

11  qualified to offer an opinion in this case because he has never designed, manufactured, or tested a

12  Type 4 tank or any of the composites used in connection with Type 4 tanks.   (Jones Mot. at 9-10.)

13  Mr. Jones' testimony is exactly the type of *ipse dixit* of the expert that should be excluded.

14  Further, Defendants assert that Mr. Jones admitted during his deposition that there was no basis

15  for his opinion.   (Id. at 11.)   Since Mr. Jones has no basis for his opinion regarding how the tank

16  ruptured, he should be precluded from offering an unsupported hypothesis.   (Id. at 13.)

17       Defendants also argue that Mr. Jones should be precluded from testifying regarding the

18  void content of the cylinder because it is not based on his own work, but on the work of

19  Plaintiff's expert, Mr. Spencer.   (Id.)   The foundation for Mr. Jones' opinions is based on imaging

20  of the void content provided by Mr. Spencer's daughter and Mr. Jones made no effort to verify

21  that the imaging was done properly and accepted the work at face value.   (Id. at 13-14.)   Since the

22  opinion related to the void content was based on the work of another expert's daughter who will

23  not be testifying in this case, Defendants contend there is no foundation for his opinion.   (Id. at

24  14.)

25            2.   Momentum's argument in opposition

26       Momentum counters that Defendants attempt to challenge Mr. Jones' opinion that a crack

27  in the subject tank's boss allowed gas to escape into the layers of carbon fiber that was wrapped

28  around the tank which compromised the strength of the carbon fiber and led to the tank rupture.

1    However, Defendants do not address the foundation for Mr. Jones' opinion which comes directly

2    from Cobham's own investigation and the testimony of Cobham's employees, nor do Defendants

3    discuss Mr. Jones' 62-page report which explains the basis for his opinions.  Defendants ignore

4    Mr. Jones' detailed report, his methodology, reasoning, and the basis for his ultimate opinion.

5    (Jones Opp. at 19.)

6        Momentum further asserts that Mr. Jones did not admit that there was no basis for his

7    opinion as asserted by Defendants.  Cobham's failure to even address Mr. Jones' methodology is

8    fatal to its argument.  It is not surprising that Defendants make no attempt to show that Mr. Jones'

9    did not use reliable methodology in investigating and arriving at his conclusions, since Mr. Jones

10    explained that he conducted multiple, thorough inspections of the subject vehicle, damaged

11    component parts, the sister truck, and photographs.  (Id. at 22.)

12        Momentum argues that Cobham has not proffered any showing that Mr. Jones' methods

13    were unreliable and only submits snippets of his deposition and does not address the substance of

14    the reports.  Further, Mr. Jones can properly rely on photos of the voids provided by Plaintiffs'

15    expert, Brian Spencer, which were taken by his daughter who is a mechanical engineer, and Mr.

16    Jones properly relied on Mr. Spencer's opinion in reaching his own decision.  (Id. at 23, 24.)

17        3.     Defendants' argument in reply

18        Defendants reply that Momentum's opposition suffers from the misunderstanding that

19    Cobham is seeking to prevent Mr. Jones from testifying altogether, but Defendants are only

20    seeking to limit his opinions.  Momentum fails to offer any evidence that Mr. Jones is qualified to

21    render opinions related to the design and/or manufacturing defects with the subject cylinder or the

22    testing requirements per NGV 2.  Further, Defendant argues that Momentum's opposition fails to

23    provide any evidence that Mr. Jones' opinions are reliable and based on scientific principles or

24    methods.  (Jones Reply at 2.)  Mr. Jones' experience must be sufficiently related to the particular

25    subjects at issue in the case and since Mr. Jones has no experience with Type 4 tanks, let alone

26    Type 4 CNG tanks, he is not qualified to render opinions as to the design and/or manufacture

27    defects within a Type 4 CNG tank.  (Id. at 3-4.)

28    ///

1    4.    Analysis

2    a.    **Mr. Jones' qualifications to testify as an expert in this matter**

3    Rule 702 "contemplates a *broad conception* of expert qualifications," and only a "*minimal*

4    *foundation* of knowledge, skill, and experience" is required for an expert to be qualified to testify.

5    Hangarter, 373 F.3d at 1015-16 (emphasis in original) (quoting Thomas v. Newton Int'l Enters.,

6    42 F.3d 1266, 1269 (9th Cir. 1994)).

7    Mr. Jones specializes in analyzing the mechanical, environmental and material causes of

8    failures in engineered systems with an emphasis in vehicle and transportation equipment, piping

9    and pressure vessels, and machinery.  (Curriculum Vitae of Aaron J. Jones, P.E., 199, ECF No.

10   132-1.)  As relevant here, his areas of expertise include failure analysis, composites/carbon fiber,

11   metallurgy, explosion investigation, and truck and bus engineering.  He is a Ph.D. Candidate with

12   his coursework and qualifying examination completed and has a B.S. and M.S. in Metallurgical

13   and Materials Engineering from Illinois Institute of Technology.  He is a licensed professional

14   engineer in the States of Illinois and Nevada, a certified vehicle fire investigator and a certified

15   fire and explosion investigator.  (Id.)  As relevant here, he has attended continuing education in

16   Fractography (1999), Vehicle Fire Arson and Explosion Investigation (2005), Professional

17   Engineering Boot Camp, ISPE (2007), Arc Mapping Basics - IAAI (2015), Investigating Motor

18   Vehicle Fires - IAAI (2015), Ethics and Fire Investigator - IAAI (2015), and Vehicle Fire

19   Investigation Training Program – NAFI (2017).  He is on the following professional committees

20   and peer review: Editorial Review Board/Associate Editor - Journal of Failure Analysis and

21   Prevention, ASM International (2012-Present); Peer Review- ASM Handbook Volume 4E: Heat

22   Treating of Nonferrous Alloys; Member - SAE Motor Vehicle Fire Investigation Task Force

23   (2013-Present); Member-The Failure Analysis Society (Formerly ASM Failure Analysis

24   Committee (2015-Present).  (Id. at 200.)

25   Defendants argue in reply that Mr. Jones has no experience with Type 4 tanks and that

26   Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co., 958 F.2d 1169 (1st Cir. 1992) and Diefenbach

27   v. Sheridan Transp., 229 F.3d 27, 29 (1st Cir. 2000), which are cited by Momentum, support

28   excluding his testimony.  (Jones Reply at 4.)  In Tokio Marine & Fire Ins. Co., the Court found

that the trial court properly excluded expert testimony on crane defects.  The expert testimony on whether the absence of a load moment indicator was a defect called for meaningful cost benefit analysis including how hydraulic cranes work and operate, crane design, manufacture and marketing, and applicable industry standards and the expert admitted he had never designed cranes, worked for a crane manufacturer, and there was no evidence of publication or in-depth studies on the subjects of cranes and he conceded he was not an expert in crane maintenance, crane operation, or load moment indicators, and his background did little to suggest expert knowledge of relevant economic issues and industry standards.  Tokio Marine & Fire Ins. Co., 958 F.2d at 1174.  Further, the expert had never examined the crane involved in the accident nor had he spoken to the crane operator.  Id.  The court was clear that it was the expert's "failure to measure up in any one of several possible ways—educationally or experientially—that led to his rejection: '[a] true expert in crane defects would be a mechanical engineer, a person with vast experience in the design and manufacture of cranes, or a person involved in the teaching thereof.' "  Id. at 1175.

In Diefenbach, the court concluded that a maritime captain was well qualified to testify regarding docking and undocking even though he had never served aboard the type of vessel at issue in the action.  229 F.3d at 31. The captain had testified that he was familiar with the type of vessel, and they used the same equipment as the vessels on which he served.  Id.

Here, Momentum has presented evidence that Mr. Jones has investigated pressure vessels, including Type 4 tanks.  Specifically in early 2019, Mr. Jones was asked by Waste Management to look into some leakage from Cobham tanks in the field which he advised should be removed from service.  (June 15, 2023 Deposition of Aaron Jones, P.E., 20:8-23, ECF No. 132-1 at 207-38.)  This is the second time that Mr. Jones has been involved in litigation for failure of a Type 4 tank.  (Id at 21:22-25.)

While Defendants focus on Mr. Jones' experience with Type 4 cylinders, Mr. Jones has also previously investigated Hexagon/agility cylinders and has looked at Xperion and/or Luxfer failures in the past.  (Id. at 110:3-10.)  This is the first COPV explosion where he determined the cause was a design and/or manufacturing failure.  (Id. at 110:11-14.)  Mr. Jones uses the scientific

22

method in his investigation.  (Id. at 110:15-18.)  Mr. Jones' familiarity with the NGV 2 is based on dealing with clients that utilize COPVs.  (Id. at 117:23-118:9.)  Mr. Jones has attended other failure analysis classes and teaches his employees how to do failure analysis.  (Id. at 122:18-21.)  Mr. Jones has been working with composites since he got out of college and has weighed in on design but has not designed or manufactured composites.  (Id. at 124:2-22.)  Mr. Jones stated that it would be very difficult to demonstrate that a leak could lead to a rupture, but it might be possible.  (Id. at 138:1-7.)  He is basing his opinion that there was a gas flow laterally through the carbon filter on the testimony of Wolfe, Pemberton and other work he has seen.  (Id. at 138:17-139:10.)  Mr. Jones forgot exactly where, but the ASM Handbook talks about something similar in a rocket motor case.  (Id. at 139:11-15.)

In 2011, Mr. Jones investigated a rupture that was caused by a forklift improperly secured on the back of a truck and it rolled into the BOC while the truck was in operation. A puncture by the forks of the forklift caused the damage.  (Id. at 22:2-8.)  Mr. Jones has also been involved in many pressure investigations and looked at some Type 3 tanks when working for Packer Engineering.  (Id. at 23:13-24.)  In this case, Mr. Jones inspected the sister cylinders twice and some exemplar cylinders.  (Id. at 30:11-24.)  Mr. Jones has personally performed a burst test and a cycle test on Type 1 cylinders.  (Id. at 130:22-131:13.)

Defendants assert that Mr. Jones is not qualified to offer an opinion in this case because he has never designed, manufactured, or tested a Type 4 tank or any of composites used in connection with Type 4 tanks. (Jones Mot. at 9-10, Jones Reply at 3.)  However, "in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally."  Hankey, 203 F.3d at 1168.  Admissibility turns on relevance and reliability, including whether the expert has appropriate qualifications such as "some special knowledge, skill, experience, training or education on that subject matter" and "[w]hether the methodology or technique the expert uses 'fits' the conclusions[.]"  Id.  As long as an expert testifies within the reasonable confines of his subject area, a "lack of particularized expertise goes to the weight of [the] testimony, not its admissibility."  United States v. Garcia, 7 F.3d 885, 890 (9th Cir. 1993) (citing United States v. Little, 753 F.2d 1420, 1445 (9th Cir. 1984.); Avila v.

1    Willits Env't Remediation Tr., 633 F.3d 828, 839 (9th Cir. 2011); Hankey, 203 F.3d at 1168.

2         The Court finds that Momentum has presented evidence that Mr. Jones meets at least the

3    minimal qualifications to issue an opinion on the cause of the subject incident and the industry

4    standards.

5         **b.    Whether Mr. Jones' opinion is without basis**

6         Defendants assert that Mr. Jones admitted during his deposition that there was no basis for

7    his opinion (Jones Mot. at 11) and that since Mr. Jones has no basis for his opinion regarding how

8    the tank ruptured, he should be precluded from offering an unsupported hypothesis (id. at 13).

9         Mr. Jones completed a report in this matter on April 4, 2023.  (Fusion Engineering Report

10   prepared by Aaron J. Jones P.E. ("Jones Report"), ECF 132-1 at 131-198.)  He concluded that

11   Cobham's design and manufacture processes of the cylinders fell below the standard of care

12   within the carbon filter cylinder industry and that the evidence indicates that the rupture of the

13   Cobham cylinder was the cause of the subject incident.  (Id. at 132, 134.)  Prior to coming to his

14   conclusion, Mr. Jones considered evidence such as the photographs from the surveillance videos

15   of the incident and Defendant Cobham's diagram of the resting location of the debris; the design,

16   manufacture, and testing of the cylinders by Cobham; and the specific results of the production

17   lot of the subject cylinder.  (Id. at 134-140.)  Further, Mr. Jones considered the history of the

18   problems with initial testing of the cylinders, change in the cylinder design, and Cobham's

19   method of leak testing the cylinders.  (Id. at 140-52.)  He also considered the history of the

20   subject cylinder after it had been received by Momentum and the installation of the cylinder by

21   Pape.  (Id. at 153-55.)  There were also prior incidents in which Cobham's cylinders had

22   developed a leak and he considered Cobham's leak testing of the cylinders.  (Id. at 157-58.)  Mr.

23   Jones considered the ANSI NGV 2 standards for carbon composite cylinders.  (Id. at 158-63.)

24        Defendants argue that Mutersbaugh v. Gen. Elec., Inc., No. 5:17-CV-1300, 2019 WL

25   1409379 (N.D. Ohio Mar. 28, 2019) supports exclusion of the testimony because Mr. Jones

26   did not test his theory, explain why it could not be tested, and failed to explain why his theory had

27   not resulted in similar incidents and that therefore his testimony should be excluded.  (Jones

28   Reply at 6.)  In Mutersbaugh, the court found that the expert did not use scientific methodology

in developing his opinion but found a failed component and then formulated a theory that would lead back to that failed component.  2019 WL 1409379, at *3.  The expert did not physically examine the components and only looked at pictures, did not test his theory on similar components and failed to adequately explain why the testing could not be done, and wholly failed to explain why his alleged conclusion has not led to a single other fire being reported that was caused by the alleged defect.  Id.

Here, several inspections were conducted of the subject ruptured cylinders and the other cylinders installed on the subject and sister trucks, including analysis of the epoxy, evaluation of the porosity, analysis of the fracture of the carbon fiber overwrap, and fractographic analysis of the subject boss.  (Jones Report at 163-75.)  The bosses from other manufacturers were examined and compared to the design of the Cobham boss utilized on the subject cylinder.  (Id. at 175-181.)  Mr. Jones then discusses his reasoning and findings, including problems with the design of the boss, inconsistencies in manufacturing, testing criteria, and Cobham's investigation into leaking of the cylinders prior to the subject incident.[8]  (Id. at 181-91.)  Mr. Jones also considered that there was no evidence that the subject cylinder sustained any damage after it left Cobham's possession.  (Id. at 190-91.)  "Rule 702's 'sufficient facts or data' element requires foundation, not corroboration."  Elosu, 26 F.4th at 1025.  "Consistent with the court's gatekeeping function, Rule 702 instructs a district court judge to determine whether an expert 'had sufficient factual grounds on which to draw conclusions.' "  Id. at 1025-26.

Momentum has presented evidence that Mr. Jones' opinion is based upon his review of documents, evidence, and testing of the subject cylinder and other similar cylinders and therefore the Court finds that Momentum has demonstrated that there is a basis for Mr. Jones' opinion.

### c.    Opinion regarding void content of cylinder

Defendants argue that Mr. Jones should be precluded from testifying regarding the void content of the cylinder because it is not based on his own work but on the work of Plaintiffs'

---

[8] While Defendants argue that Momentum misleadingly states testing protocols revealed a design defect in the subject tank and that the issue was actually changed and implemented in the subject tank (Jones Reply at 6 n.3), this is an issue for the jury and irrelevant to the instant motion.

1   expert, Mr. Spencer; the imaging of the void content provided by Mr. Spencer's daughter; and

2   Mr. Jones made no effort to verify that the imaging was done properly and accepted the work at

3   face value.  (Id. at 13-14.)

4        Rule 703 of the Federal Rules of Evidence provides:

5        An expert may base an opinion on facts or data in the case that the expert has been
         made aware of or personally observed. If experts in the particular field would
6        reasonably rely on those kinds of facts or data in forming an opinion on the
         subject, they need not be admissible for the opinion to be admitted. But if the facts
7        or data would otherwise be inadmissible, the proponent of the opinion may
         disclose them to the jury only if their probative value in helping the jury evaluate
8        the opinion substantially outweighs their prejudicial effect.

9        While an expert cannot solely rely on another expert's opinion, Jerpe v. Aerospatiale, No.

10  CIV.S-03-555 LKK/DAD, 2007 WL 1394969, at *6 (E.D. Cal. May 10, 2007), the expert may

11  consider other experts' opinions in reaching their own independent judgment, United States v.

12  Pritchard, 692 F.App'x 349, 351 (9th Cir. 2017).  If the facts or data used would reasonably be

13  relied upon by experts in forming an opinion on the subject, they need not be admissible for the

14  opinion to be admitted.  Here, Defendants do not argue that the photographs are not the type of

15  evidence that would reasonably be relied upon by experts in developing an opinion but argue a

16  lack of foundation and reliability because they were taken by another expert's daughter.

17       Mr. Jones testified that Mr. Spencer provided him with images of the voids that were

18  made using an automated machine at his office.  (Jones Depo. at 76:22-77:4.)  Mr. Jones did not

19  independently verify that the images were done properly, but he believed they were Mr.

20  Spencer's daughter's work, and it was their joint work.  (Id. at 77:8-13.)

21       Momentum presents evidence that Mr. Spencer's daughter works for and has ownership in

22  Spencer Composites Corporation.  (June 6, 2023, Deposition of Brian Spencer, Ph.D. ("Spencer

23  Depo."), 14:20-25, ECF No. 137-4.)  The company has about 25 employees.  (Id. at 15:4-6.)  His

24  daughter did the work on the void and fiber volume content to the ASTM and one of the other

25  engineers did the visual microscopic void analysis.  (Id. at 15:10-15.)  Mr. Spencer's daughter

26  was a biochemical major in college until she changed her major to business.  She had lab

27  experience in college and has worked for his company for over 20 years.  (Id. at 15:18-23.)  She

28  has done dozens of void fiber content analysis prior to this.  (Id. at 16:19-22.)  The engineer who

performed the microscopic void analysis has a degree in mechanical engineering and has been trained to do void analysis.  She has been doing void analysis for years and has done many dozens.  (Id. at 16:6-18.)

To the extent that Defendants are challenging the reliability of the void analysis, the Court finds that the evidence demonstrates that the analysis was conducted by individuals with sufficient knowledge and experience to provide reliable results.  Further, as discussed supra, an expert may consider other experts' opinions in reaching their own independent judgment.  Pritchard, 692 F.App'x at 351.  An "expert can use facts, data, and conclusions of other experts to offer an opinion within the testifying expert's domain of expertise, but the testifying expert cannot vouch for the truth of the other expert's conclusion."   K&N Eng'g, Inc v. Spectre Performance, No. EDCV 09-1900VAP (DTBX), 2011 WL 13131157, at *10 (C.D. Cal. May 12, 2011); Dura Auto. Sys. of Indiana, Inc. v. CTS Corp., 285 F.3d 609, 613 (7th Cir. 2002) ("it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that there is no general requirement that the other expert testify as well").

In his report, Mr. Jones discusses how the samples were analyzed for porosity.

> Samples from three locations on the subject tank were removed at EAG labs on September 9, 2022.  The sample locations are shown in Figure 17 and were identified as locations A, B, C, respectively.  Each party involved in the litigation was provided samples for analysis. Fusion Engineering further sectioned longitudinal and transverse sections from the samples and provided them to Element Materials Technology in New Berlin, Wisconsin for polishing and photography.  The photographs of the subject tank samples were given to Brian Spencer of Spencer Composites for porosity analysis.  Mr. Spencer utilized photographic analysis software for determining the void content of the subject tank samples.
>
> Porosity in the samples of carbon fiber extracted from the subject tank ranged from 4.5% – 8.3%.

(ECF No. 312-1 at 163-64.)

Samples of the carbon fiber for other manufacturers of Type 4 CGN tanks were examined and compared to the boss utilized on the subject cylinder.  (Id. at 175.)  The samples were submitted for porosity analysis and the porosity sample report was prepared by Element Materials

Technology in the same manner as the subject tank samples.  (Id. at 176.)  In comparing the porosity of the subject cylinder to the porosity of other Type 4 CNG cylinders, the other cylinders had significantly lower porosity values than the subject cylinder.  (Id. at 177-79.)  Mr. Jones opined that the subject cylinder was defectively manufactured by Cobham, in part, because the "carbon fiber overwrap contained significant voids that far exceeded those of similar cylinders from other manufacturers."  (Id. at 192.)  The Court finds that Mr. Jones' could properly consider the Spencer laboratory findings on the void content in the subject cylinders compared to the Element Materials Technology findings on the samples of other manufacturers Type 4 CGN tanks in developing his opinion.  An expert opinion may be based in part "on what a different expert believes on the basis of expert knowledge not possessed by the first expert[,] and "this is common in technical fields."  In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig., 978 F.Supp.2d 1053, 1066 (C.D. Cal. 2013) (quoting Dura Auto. Sys. of Indiana, Inc., 285 F.3d at 613.

During the trial of this matter, the experts may testify to their opinions and address the evidence upon which they relied to come to their opinion.  However, the experts will not be allowed to vouch for or bolster another expert's opinion and, in accord with the gatekeeping function, the Court will not allow an expert to testify beyond the expert's area of expertise.[9]  If counsel believes that an expert is testifying beyond their expertise or merely parroting another expert's opinion, an objection may be made during trial.

Defendants' motion to limit the opinions of Mr. Jones is denied.

**D.      Motion to Limit the Opinion of Mr. Spencer**

1.      Defendants' argument

Defendants contend that Mr. Spencer is unqualified to render any opinions regarding the cause of the subject cylinder's failure or any metallurgical or fractographical opinions and based on his limited experience or lack thereof, he offers opinions that are inconsistent with published

---

[9]   The Court is mindful that sometimes counsel will disrupt this concept through the "art of cross-examination" or on re-direct.  To the extent this occurs, the Court will make its ruling consistent with the rules of evidence.

literature.  (Spencer Mot. at 8.)  Defendants argue Mr. Spencer is completely unqualified to render any opinions as to the cause of the subject truck's explosion and admitted during his deposition that his sole training in relation to investigating an explosion and determining its cause is basic practical experience and working with other engineers on failure analysis.  (Id. at 11.) Mr. Spencer admitted he had never received any classroom training on how to investigate an explosion and determine its cause, never reviewed any written material on how to investigate an explosion, and never received any training in accident reconstruction or accident investigation. Further, Mr. Spencer admitted that he has never investigated an explosion of a product that occurred in the field, and this is the first time he has investigated a vehicle explosion.  Mr. Spencer's generalized background in composites and designing and manufacturing COPVs does not qualify him to render opinions on the cause of a cylinder's failure in the field.  (Id. at 11.) While Mr. Spencer may be qualified to discuss the design and manufacture of COPVs, he has no experience, training, or education in determining the cause of the truck's explosion or a cylinder's rupture in the field and therefore should be excluded from testifying at trial as to the cause of the subject cylinder's failure.  (Id. at 12.)

Defendants assert that Mr. Spencer is unqualified to offer any metallurgical or fractographical opinions and has offered several criticisms of the design and manufacture of the subject cylinder which focus on metallurgical and/or fractographical issues.  Specifically, Defendants argue Mr. Spencer criticizes the fiber content and void content of the subject cylinder which he contends resulted in a reduction in its strength and performance.  (Id.)  However, Mr. Spencer admits he has no training in fractology and metallurgy and has conceded that he is not qualified to render opinions related to metallurgy and fractology but defers to Mr. Jones on these issued.  (Id. at 12-13.)  Therefore, Mr. Spencer should not be permitted to offer such opinions. (Id. at 13.)

Defendants assert that even a cursory review of Mr. Spencer's admissions demonstrates that his testimony is plain *ipse dixit* and the absence of any scientific underpinnings for his leak leading to rupture opinion renders it unreliable.  (Spencer Mot. at 13.)  Mr. Spencer's experience is with Type 3 COPVs, and the subject cylinder is a Type 4 COPV which is completely different

because the liners are composed of different materials.   (Id. at 14.)

Defendants contend that since Mr. Spencer is relying on his experience he must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  (Id. at 14 (citing FRE 702, Adv. Comm. Note (2000).)  Mr. Spencer's opinion is based on nothing more than his supposed experience with no proper basis or foundation.  (Spencer Mot. at 14.)

Finally, Defendants argue that Mr. Spencer has opined that due to the defects with the void content the voids contributed to lowering the burst pressure of the subject cylinder and since Mr. Spencer is completely unqualified to render this type of metallurgical opinion it makes his opinion equally unreliable.  Defendants assert that Mr. Spencer has admitted that his opinion that the appropriate void content is less than 2% is solely based on his experience in manufacturing tanks and customer requirement and is not based on published literature. Yet, an American Society of Metals publication asserts that the typical void content for high-void areas can be 5-10%.  Since Mr. Spencer's opinion is solely based on his own experience and not accepted by the relevant community, his opinion must be excluded.  (Id. at 17.)

2.      Plaintiffs' argument in opposition

Plaintiffs counter that Mr. Spencer is eminently qualified and offers relevant and reliable opinions in this matter.  Plaintiffs assert it is important to note that, just three days prior to Cobham shipping the subject tank to Momentum for use in the subject truck, Cobham's design team held a meeting to discuss issues with their tanks.  Cobham knew that components were prone to cracking which caused leakage but shipped the tanks anyway.  Cobham made the particular finding that "the current design does not provide sufficient margin [to] ensure an acceptable risk level going forward" and therefore, Cobham's own findings bolster Mr. Spencer's opinions.  (Spencer Opp. at 7.)

Plaintiffs argue that while Defendants assert that Mr. Spencer has no training or education in accident reconstruction, investigating automotive fires or investigating automotive explosions in the field, here it was a compressed natural gas tank comprising the subject vehicle's fueling system that exploded.  It is undisputed that the explosion was "initiated by the catastrophic

rupture of the lower tank in the enclosure located behind the cab of the subject truck." (Id. at 9 (citing Pretrial Order [Dkt No. 125] incorporating undisputed facts from Joint Pretrial Statement [Dkt. No 121 at pg. 5].)  Further, this case does not involve an automotive fire or motor vehicle collision in the field.  There is no allegation or evidence that the subject vehicle could have sustained damage sufficient to cause the explosion after William took possession of it or that there was any damage sustained sufficient to cause the explosion while Plaintiff drove the subject vehicle to the fueling station.  (Spencer Opp. at 9.)

Plaintiffs state that Defendants' arguments regarding Mr. Spencer's qualifications go to the weight of his testimony, not its admissibility.  (Id. at 9.)  The relevant analysis here is what caused the CNG tank to rupture and Mr. Spencer is more than qualified to opine on the cause of the ruptured CNG tank.  (Id. at 10-11.)  Plaintiffs argue that Mr. Spencer more than meets the threshold established by Rule 702 and Defendants' complaints regarding his knowledge, education, and experience are issues for cross examination.  (Id. at 11.)

Plaintiffs assert that Mr. Spencer admittedly testified that he was relying on the opinions of Mr. Jones on any issues of metallurgy or fractology because he has no experience in these areas, but he has read the report of Mr. Jones and finds it persuasive.  Mr. Spencer relies on Mr. Jones' opinion as a basis for his opinion that the crack in the O-ring groove existed prior to Plaintiff taking possession of the truck which was not asked during the deposition.  To the limited extent that Mr. Spencer relied on the opinion of Mr. Jones, Plaintiffs contend it is not grounds for excluding his opinions as it is well established that expert opinions may be based in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert and this is common in technical fields.  (Id.)

Plaintiffs assert that Mr. Spencer testified to employing engineering principles in investigating ruptures and has attended multiple inspections of the subject vehicles, including cutting samples from the subject tank, and having those samples examined at his laboratory where detailed cross section photographs were taken to determine the porosity of the composite wrapped around the subject tank and differential scanning calorimetry was performed on the samples of the composite.  (Id. at 12.)  Further, Mr. Spencer attended testing at EAG Labs where

measurements were taken of the subject tank, differential scanning calorimeter was performed on samples from the subject tank, high resolution photography was taken of samples from the subject tank, and pieces of the subject tank were examined by way of a scanning electron microscope including pieces of the composite and the aluminum boss.  Additionally, Mr. Spencer outsourced a "drop test" which was performed on a sample taken from the subject tank's liner.  (Id.)

Plaintiffs argue that Mr. Spencer has investigated dozens of pressure vehicle failures in his own composite work and has numerous other companies consult with him to determine why their tanks have failed.  (Id.)  While Cobham has gone to great lengths to malign Mr. Spencer's opinion as to the cause of the rupture, Plaintiffs take the position that the arguments are not persuasive.  Mr. Spencer's opinions are based on "reliable methods "and generally-accepted principles." (Id. at 13.)  Although Defendants argue that Mr. Spencer's experience is with Type 3 as opposed to Type 4 tanks, this is a distinction without a difference.  Both types are COPVs and the main difference is the type of liner.  Mr. Spencer testifies that the liner's material does not matter in determining the viability of a tank and Mr. Spenser has observed this type of failure in his own designs and provided examples.  (Id. at 14.)

Plaintiffs argue that Mr. Spencer's overarching opinion is that the subject tank was poorly manufactured and one of the grounds for this opinion was that the tank had a "higher than normal" void content.  (Id. at 15.)  Mr. Spencer's opinion as to void content is based on decades of experience with COPVs and his theory has been tested numerous times.  Through his research and development, Mr. Spencer has made composite components that ended up having excess voids and examined the components microscopically to determine the cause of failure.  (Id. at 18.)  Substantial scientific analysis was employed to determine the void content of the subject tank and Mr. Spencer's opinion regarding the void content has a reliable basis in the knowledge and experience of the relevant discipline and should be allowed.  (Id. at 17-18.)

3.  Defendants' argument in reply

Defendants reply that Plaintiffs have not presented any evidence that Mr. Spencer is qualified to opine as to the cause of the subject cylinder's rupture in the field.  (Spencer Reply at 3-4.)  Mr. Spencer does not have any experience or training in determining the cause of the

explosion, accident reconstruction, or investigating automotive fires or explosions.  The cause of the subject cylinder's failure resulted in the subject vehicle's explosion which necessarily requires Mr. Spencer to opine on the cause of the subject vehicle's explosion.  (Id. at 4.)  Since the subject cylinder passed Cobham's internal testing and ruptured in the field, Mr. Spencer is not qualified to render an opinion as to the cause of the subject vehicle's explosion.  (Id. at 4-5.)

Further, Defendants argue that Mr. Spencer has no experience in the area on metallurgy or fractology and has deferred these issues to Mr. Jones.  (Id. at 5.)  Mr. Spencer is not relying in part on Mr. Jones' opinion but is attempting to parrot Mr. Jones' opinions and claim them as his own.  (Id. at 6.)  Defendants contend that Mr. Spencer cannot rely on Mr. Jones' opinions that were developed solely for the purpose of litigation.  (Id. at 6-7.)  Defendants make the same arguments addressed above that Mr. Spencer has not affirmatively shown the requirements in the Rule 702 Advisory Notes and that judges can consider several factors in determining whether to admit expert testimony.  (Id. at 7-8.)  Mr. Spencer's sole qualifications pertain to experience with offshore oil platforms utilizing Type 3 metal liners and this case involves a Type 4 cylinder using polymer liners that are fully wrapped in carbon fiber.  (Id. at 8.)

4.   Analysis

a.   **Mr. Spencer's qualifications to testify as an expert in this matter**

Mr. Spencer has a B.S. in Architectural Engineering and a Ph.D. in Engineering Mechanics from the University of Nebraska, Lincoln, Nebraska; a M.E. in Industrial Engineering from the University of California, Berkeley, California; and a M.E. in Mechanical Engineering from the University of California, Davis, California.  Since 1994, Mr. Spencer has been president of Spencer Composites Corporation dedicated to the design, development, and fabrication of advanced composite products.  (Spencer Curriculum Vitae ("Spencer C.V.") 1, ECF No. 137-3.) He holds over thirty patents, and professional affiliations include: Society for the Advancement of Material and Process Engineering ("SAMPE"); Sigma Xi, The Scientific Research Society; Advance Composites Seminars – Founder and General Partner; Senior Member of The Society of Manufacturing Engineers ("SME"); SME Board Review, Session Chairman and Speaker; CA/SME Board of Advisors from 1998 to 2000; SAMPE Session Chairman, Speaker and

International Committee Chair: Sports and Recreation.  (Id.; June 6, 2023 Deposition of Brian Spencer, Ph.D. ("Spencer Depo."), 12:17-22, ECF No. 12.)  Some of his patents have to do with COPVs, including one for a Type 4 COPV.  (Spencer Depo. at 12:23-13:4, 13:18-21.)   He also has an extensive list of publications addressing composites.  (Spencer C.V. at 2-4.)  Composites was the subject of Mr. Spencer's Ph.D. and dissertation which addressed manufacturing thick wall composite, both manufacturing and determining what the residual stress state is in a composite structure that has been manufactured and cured.  (Id. at 161:1-9.)  Mr. Spencer also gives lectures around the world on composites and has taught weeklong classes in both the United States and Australia on composite manufacture and design, including Type 4 pressure vessels. (Spencer Depo. at 161:10-22.)

Mr. Spencer's company was founded on doing research and development for other companies in developing their product or evaluating materials.  They have worked with composite pressure vehicles and other structural members since the first day and composite pressure vehicles have been the main part of their business as far as development is concerned. (Spencer Depo. at 14:16-25.)  Mr. Spencer has designed and built Type 4 vessels from six or eight inches in diameter all the way up to six to nine meters in diameter.  They have made some very large and medium sized vessels ranging in pressure ratings from a few thousand PSI up to 15,000 PSI or higher, including designing Type 4 vessels.  (Id. at 18:1-25, 19:20-25.)   Mr. Spencer has also done some of the NGV 2 testing concentrating on cycle tests, elevated temperature cycle tests, burst tests, and lot acceptance tests such as proof tests and volume expansion in the research and development phase.  (Id. at 20:19-21:8.)

The Court finds that Plaintiffs have presented evidence that Mr. Spencer meets at least the minimal qualifications to issue an opinion on the subject cylinder and the industry standards.

**b.      Opinion in regards to Type 4 cylinders**

Defendants rely on Diviero v. Uniroyal Goodrich Tire Co., 919 F.Supp. 1353 (D. Ariz. 1996), aff'd, 114 F.3d 851 (9th Cir. 1997), and Berry v. Crown Equip. Corp., 108 F.Supp.2d 743, 744 (E.D. Mich. 2000), to argue that experience in the general area of composites and Type 3 cylinders is not sufficient to allow Mr. Spencer to testify as to the cause of the explosion of the

1    Type 4 cylinder.  (Spencer Mot. at 11.)

2        In <u>Diviero</u>, a witness issued an opinion regarding whether a tire was defective.  He was an

3    engineer and had experience working with tires for many years.  He had examined numerous tire

4    failures and was president of a tire consulting company but had never been engaged by a

5    manufacturer of steel belted radial tires, had never conducted controlled testing of steel belted

6    radial tires in a plant setting, and had worked with bias belted, not steel belted radial tires.  He

7    admitted that the two types of tires differed significantly, and he was not aware of the right

8    compatibility of steel to rubber interface with steel belted radial tires.  He was unaware of the

9    mechanical, chemical, or thermal components that went into the design system for the steel to

10   rubber interface on a steel belted tire.  <u>Diviero</u>, 919 F.Supp. at 1356.  The court found that it was

11   clear from the testimony that was presented that the witness did not possess the training or

12   expertise to render a valid scientific opinion concerning whether the tires were defective.

13   "Expertise in the technology of fruit is not sufficient when analyzing the science of apples.

14   Courts have excluded the testimony of engineers because their expertise was not particular to the

15   science involved in the case."  <u>Id.</u> at 1357.  The court found that the witness' expertise and

16   experience did not fit the facts of the case.  <u>Id.</u>

17       In <u>Berry</u>, the plaintiff was injured while driving a stand-up forklift and alleged that the

18   forklift was defectively designed.  108 F.Supp.2d at 745-46.  In support of her claim, she

19   employed a "safety consultant" who considered himself an expert in accident prevention and

20   safety.  The witness had a B.S. degree in speech with minors in English and science and had

21   attended multiple safety training seminars at the Chrysler Training Institute.  Prior to becoming a

22   safety consultant, he had worked in an automobile manufacturing plant, for one year as a safety

23   director, and one year with the National Safety Council.  He had never published any articles

24   regarding forklifts, and the only article he wrote that was published concerned butane lighters.

25   He had worked as a forklift operator operating a sit-down forklift.  He was familiar with stand-up

26   forklifts because they were used in the manufacturing plants where he had worked, but had never

27   been employed as a forklift service technician or by a forklift manufacturer, nor had he ever

28   attempted to service a forklift or designed any product connected with the safety of forklifts that

went into production.   Id. at 750.   The court ultimately found that any opinion rendered by the witness concerning defective design of the forklift was beyond his expertise in accident prevention and safety.   Id. at 753.

Unlike the cases relied upon by Defendants, Mr. Spencer's qualifications do fit the facts of this case.   He has a Ph.D. in Engineering Mechanics, and the subject of his dissertation was composites.   (Spencer C.V. at 1.)   He holds over thirty patents, including patents in composites and some of them have to do with COPVs, including one for a Type 4 COPV.   (Id.; Spencer Depo. at 12:23-13:4, 13:18-21.)   Mr. Spencer's company has worked with composite pressure vehicles and other structural members since the first day and composite pressure vehicles have been the main part of their development; and they have developed, designed, manufactured, and tested COPDs, including Type IV vessels.   (Spencer Depo. at 14:16-25, 19:20-25, 20:19-21:8.) Further, Mr. Spencer lectures around the world on composites and has taught classes on composite manufacture and design, including Type IV pressure vessels.   (Id. at 161:10-22.)

Defendants seek to exclude his testimony because Mr. Spencer has not had training on how to investigate an explosion and has no training in accident reconstruction or accident investigation, investigating vehicle fires, or automotive explosions but he was not retained, nor is he opining, on such issues.   Rather, Mr. Spencer's testimony directly addresses the design, manufacturing, and condition of the Type 4 cylinder which the Court finds is within his area of expertise.

Defendants also argue that Mr. Spencer's generalized background in composites and designing and manufacturing COPVs does not qualify him to render opinions on the cause of a cylinder's failure in the field and his experience is with Type 3 COPVs, but the subject cylinder is a Type 4 COPV which is completely different because the liners are composed of different materials.   (Spencer Mot. at 11, 14.)   Mr. Spencer has designed and tested Type 3 and Type 4 vessels and testified that the difference between the two does not make a difference as far as determining the stress and strained state of the composite.   (Spencer Depo. at 19:20-25, 64:8-14, 68:21-69:3.)   Further, Mr. Spencer has investigated several dozen failures in pressure vessels, including Type 4 vessels in the past.   (Id. at 140:8-141:10.)

While Defendants contend that Mr. Spencer is not qualified to testify as to the cause of the rupture of the tank, Mr. Spencer has observed failure of COPVs due to cracks in the liner that allowed leakage into the composite.  (Id. at 62:22-64-2.)   He has investigated several dozen failures in pressure vessels analyzing why the vessels failed, including Type 4 pressure vessels that ruptured in testing.  (Id. at 140:8-141:10.)   Although Defendants argue that Mr. Spencer is not qualified to testify as to a vehicle explosion in the field, Mr. Spencer has extensive experience in investigating the failure of pressure vessels and it is undisputed that the subject vehicle exploded due to a rupture of one of the CNG cylinders.  The Court finds that Mr. Spencer is qualified to issue an opinion as to the failure of the Type 4 cylinder at issue in this action.

**c.      Whether Mr. Spencer's opinion is without basis**

Mr. Spencer testified that he inspected the remains of the subject truck and has seen photographs.  (Spencer Depo. at 29:22-25.)   Mr. Spencer's inspection was focused on the BOC and the cylinders within the BOC.  (Id. 30:15-18.)   He also has seen the sister truck and looked through the compartment where the tanks were stored and saw the tanks.  (Id. at 30:19-31:3.)   He inspected the subject cylinder three times.  (Id. at 20:9-13.)   His initial inspection occurred on October 7, 2020, the truck was on a pallet, and they were able to inspect the tank.  (Id. at 31:16-32:3.)   He looked at the locations where the tank had burst, the composite had failed, and the parts and pieces that had been collected from the accident.  No sampling or testing was done on this date.  (Id. at 31:6-17.)   He next inspected the subject cylinder on November 19, 2021, and samples were marked off and cut for further examination.  (Id. at 33:20-34:5.)   The samples were tested by EAG sometime in early 2022.  (Id. at 34:13-17.)   There were two other people who were experienced with taking photographs who took pictures and provided him with photographs of the cylinders.  (Id. at 35:13-25.)

A third inspection of the cylinder was conducted on September 2022 at EAG.   Mr. Spencer observed a differential scanning calorimeter that was performed on the samples of the tank and high-resolution photographs were done of sections of the boss and also SEM.  (Id. at 38:3-16.)   Mr. Spencer did have a differential scanning calorimetry done on the samples at his facility to verify that the resin was cured.  (Id. at 39:19-25.)

Mr. Spencer also described how a leak would lead to a rupture and that he has observed this multiple times on tanks in doing their research and development work.  (Id. at 62:22-62:25.)  They did quite a bit of work examining this on offshore oil platforms.  They had a crack in the thin liner that allowed water they were using for testing to get into the composite.  They were seeing a drop in pressure and were able to determine that the water had infused into the composite and in some cases on a shorter test sample saw that the composite failed due to the crack in the liner that allowed the water to get in to depressurize the lower levels of the winding.  (Id. at 63:3-64:2.)  These tests were with Type 3 tanks, but while the liner is different physics holds.  The engineering still holds for all these types of tanks, and it does not matter what the liner is made of as far as determining the stress and strained state of the composite you are putting on the outside of it.  (Id. at 64:8-14.)  The tank itself is very, very thin and does not take any load, it is just a barrier, but they can be designed to take a significant portion of the load depending on the design.  (Id. at 64:21-65:7.)  Mr. Spencer has not had any problem with Type 4 liners being breached and has only seen this with metal liners.  (Id. at 64:8-15.)

To investigate an explosion, Mr. Spencer uses engineering principles: identifying the design basis of the tank, what it is required to do; the geometry; the pressures, temperatures, and such; they will go through their own finite element analysis to figure out what stress state composites are in under different loads; and look at the physical evidence to try and figure out if there are any defects in the components used to make the vessel.  (Id. at 141:19-142:7.)   He will look at every possible cause that could result in the result and go through each of them to figure out what is happening.  (Id. at 142:22-143:2.)

In his Rule 26 report, Mr. Spencer set forth the evidence and documents reviewed, and the site visits that form the basis of his opinion.  (Johnson Matter Findings 6-9, ECF No. 133-1.)  The report states that Mr. Spencer's opinions are based on "my expertise, education and training, and Cobham Design Analysis Report Dated 5/18/2018 for P/N 4126-80 and other documents produced by Cobham.  My opinions are also based on my review of the physical evidence, including inspections at Dunkel, EAG, and inspections of vessel samples at my lab in Sacramento, CA."  (Id. at 9.)  The report sets forth findings regarding the filling of the vessel at

1   ANG; manufacturing of the cylinder by Cobham and conduct of Momentum.  Each of the eleven

2   findings relating to Cobham set forth the findings and basis.  (Id. at 10-12.)

3          The Court is unpersuaded by Defendants argument that Mr. Spencer's opinion was *ipse*

4   *dixit* and lacks scientific underpinnings.    Rather, the evidence presented by Plaintiffs

5   demonstrates that Mr. Spencer examined the vessel on multiple occasions, conducted testing,

6   reviewed documents and photographs and applied his knowledge, experience, and training to

7   arrive at his opinion.   As discussed supra, Court's gatekeeping role is to assess reliability under

8   702 and not determine the veracity of the expert's opinions.  Elosu, 26 F.4th at 1020, 1026.

9          **d.     Opinion regarding void content of cylinder**

10         As discussed supra, while an expert cannot solely rely on another expert's opinion, Jerpe,

11  2007 WL 1394969, at *6, the expert may consider other experts' opinions in reaching their own

12  independent judgment, Pritchard, 692 F.App'x at 351.  Defendants argue that Mr. Spencer is just

13  parroting the opinion of Mr. Jones and claiming them as his own (Spencer Opp. at 6), however,

14  Mr. Spencer testified that he is not relying on any of Mr. Jones' work for his opinions, but he

15  believes that Mr. Jones' work backs up his own opinion, (Spencer Depo. at 82:8-16).   Mr.

16  Spencer may properly consider that the opinion of Mr. Jones supports his own findings.  Also as

17  discussed supra, an "expert can use facts, data, and conclusions of other experts to offer an

18  opinion within the testifying expert's domain of expertise[.]"   K&N Eng'g, Inc, 2011 WL

19  13131157, at *10.  In fact, "it is common in technical for an expert to base an opinion in part on

20  what a different expert believes on the basis of expert knowledge not possessed by the first

21  expert; and it is apparent from the wording of Rule 703 that there is no general requirement that

22  the other expert testify as well."  Dura Auto. Sys. of Indiana, Inc., 285 F.3d at 613.  Mr. Spencer

23  may properly consider the opinions of other experts as long as he reaches his conclusion based on

24  his own independent judgment.  Pritchard, 692 F.App'x at 351.  However, as discussed above, the

25  Court will not allow any expert to vouch for or bolster another expert's opinion and, in accord

26  with the gatekeeping function, the Court will not allow an expert to testify beyond the expert's

27  area of expertise.  If counsel believes that an expert is testifying beyond their expertise or merely

28  parroting another expert's opinion, an objection may be made during trial.

To the extent that Defendants argue that Mr. Spencer's opinion is not based on published literature, the Court finds that goes to the weight of his testimony and can be addressed on cross examination, but it does not go to the admissibility of the testimony.  Defendants also argue that Mr. Spencer opines that void content should be less than 2% but published literature refutes this noting that typical void content for high-void areas can be 5-10%.   (Spencer Reply at 9.) Alternative or opposing opinions or tests do not "preclude the admission of the expert's testimony – they go to the weight, not the admissibility."  Kennedy v. Collagen Corp., 161 F.3d 1226, 1231 (9th Cir. 1998).  Furthermore, "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."  Kennedy, 161 F.3d at 1231 (quoting McCulloch v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995)).

Defendants motion to limit the opinions and testimony of Brian Spencer, P.E. is denied.

**IV.**

**CONCLUSION AND ORDER**

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendants Carleton and Cobham's motion to limit opinions and testimony of Pape's Expert Robert A. Carnahan (ECF No. 131), filed April 4, 2024, is GRANTED IN PART AND DENIED IN PART as follows:

    a. The motion to exclude Mr. Carnahan's testimony that a leak in the tank caused the rupture of the cylinder cannot be ruled out is GRANTED; and

    b. The motion to exclude Mr. Carnahan's testimony on his interpretation of ANSI NGV 2 is DENIED;

2. Defendants Carleton and Cobham's motion to limit opinions of Momentum's Expert Aaron Jones, P.E. (ECF No. 132), filed April 4, 2024, is DENIED; and

3.  Defendants Carleton and Cobham's motion to exclude or limit opinions and testimony of Plaintiffs' Expert Brian Spencer (ECF No. 133), is DENIED.

IT IS SO ORDERED.

Dated:   **August 8, 2024**

_____
UNITED STATES MAGISTRATE JUDGE